# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 23, 2018          Decided June 15, 2018

No. 15-3056

UNITED STATES OF AMERICA,
APPELLEE

v.

DAWAYNE BROWN, ALSO KNOWN AS GOON,
APPELLANT

Consolidated with 15-3065, 15-3066, 15-3067

Appeals from the United States District Court
for the District of Columbia
(No. 1:13-cr-00203-5)
(No. 1:13-cr-00203-3)
(No. 1:13-cr-00203-6)
(No. 1:13-cr-00203-2)

*Christine Pembroke*, appointed by the court, argued the cause and filed the briefs for appellant Dawayne Brown.

*Mary E. Davis*, appointed by the court, argued the cause for appellant Marquette Boston. With her on the briefs was *Pleasant S. Brodnax III*, appointed by the court.

*Barbara E. Kittay*, appointed by the court, argued the cause and filed the briefs for appellant Ira Adona.

*Jonathan Zucker*, appointed by the court, argued the cause and filed the briefs for appellant Keith Matthews.

*James A. Ewing*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Elizabeth Trosman*, *Elizabeth H. Danello*, and *George P. Eliopoulos*, Assistant U.S. Attorneys.

Before: GARLAND, *Chief Judge*, and KAVANAUGH and MILLETT, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

Concurring opinion filed by *Circuit Judge* MILLETT.

Opinion dissenting in part filed by *Circuit Judge* KAVANAUGH.

PER CURIAM: A jury convicted Dawayne Brown, Marquette Boston, and Keith Matthews of crimes associated with unlawful distribution of PCP. A fourth defendant, Ira Adona, pled guilty before trial. The district court sentenced Brown to 14 years in prison; Boston to eight years; Matthews to nine years; and Adona to nine years. Adona's sentence was to be served consecutively to a prison sentence of two years and four months imposed by the D.C. Superior Court for Adona's attempted assault with a dangerous weapon.

Defendants challenge their convictions and sentences. Brown argues that: (i) the district court's jury instructions were erroneous in certain respects; and (ii) the district court based Brown's sentence on an erroneous factual finding. Boston

contends that the evidence was insufficient to support his conviction for possession with intent to distribute PCP. Adona argues that: (i) the district court double counted a D.C. Superior Court conviction in determining his sentence; and (ii) his federal and D.C. sentences should run concurrently, not consecutively. Matthews argues that the district court erred in sentencing because: (i) the court enhanced Matthews' sentence based on attempted assault with a dangerous weapon even though, according to Matthews, attempted assault with a dangerous weapon is not a crime of violence; and (ii) the district court failed to adequately explain Matthews' above-Guidelines sentence.

We affirm the judgments of the district court with respect to Brown and Boston. We vacate the sentences of Adona and Matthews, and we remand the case to the district court for resentencing of those two defendants.

I

Louis Clifton lived in the Woodberry Village apartment complex in Washington, D.C. On January 12, 2013, Clifton walked into the Metropolitan Police Department's 7th District station and told the officers an extraordinary story: Armed men had taken over his apartment and were using the apartment to manufacture and sell PCP – all while Clifton continued to live there.

According to Clifton, at the end of December 2012, Dawayne Brown and Keith Matthews attacked Clifton in the foyer of his building and demanded access to his apartment. Clifton refused. He managed to break free and fled to the safety of his apartment. Clifton thought that was the end of it. He was wrong.

One week later, Dawayne Brown again approached Clifton – this time, with a gun. Brown forced Clifton into a local Dollar Store at gunpoint and had Clifton make a copy of Clifton's house key. Clifton complied, and Brown immediately took the key. From then on, Brown and Matthews used Clifton's apartment as they pleased. They came and went when they wanted, without permission. And they used the apartment to prepare "dippers" – cigarettes dipped in PCP – and to store the money earned from selling those dippers.

Clifton endured Brown and Matthews in his apartment for several weeks before going to the police. He claimed to have sought help discreetly at first, including from family members. But that proved ineffective. Finally, he turned to the police for help evicting his unwelcome, PCP-dealing home invaders.

The police traveled to Woodberry Village and entered Clifton's apartment, using the key that Clifton had provided them. A surprised Brown was inside the apartment. Police placed Brown on a sofa and handcuffed him. When they lifted him from the sofa, they found a loaded handgun. The police continued their search of Clifton's apartment and discovered an Uzi nine-millimeter semi-automatic rifle and a .38-caliber revolver under the love seat. They also discovered evidence of PCP, including glass vials with various amounts of PCP. In total, 44.4 grams of PCP were recovered.

The police searched Brown's cell phone. Text messages on Brown's phone led police to pursue Keith Matthews.

On March 7, 2013, police arrested Matthews inside another Woodberry Village apartment. A search of Matthews' phone led police to discover that the takeover of Clifton's apartment was not an isolated event. Brown,

Matthews, and some friends had formed a drug-dealing operation that they called "Little Mexico." Little Mexico's method of operation involved using Woodberry Village apartments to stash guns and sell PCP.

Matthews' cell phone led police to Tiffany Williams' apartment. When police executed a search warrant at Williams' home, they found Williams, Ira Adona, Breal Hicks, and Williams' six-year-old daughter. Police arrested the three adults and searched the apartment. The search yielded evidence similar to that found in Clifton's apartment: partially filled PCP vials, three handguns, and Everclear grain alcohol, a known cutting agent for PCP.

Tiffany Williams cooperated with the police and led them to the apartment of Conovia Eddie, another member of Little Mexico. After obtaining a search warrant, the police raided Eddie's apartment. They used a battering ram to enter after their demands to open the door had been ignored. Inside, they found Marquette Boston. Boston was standing near the bathroom, and the odor of PCP was coming from a running toilet. Police arrested Boston. Police found vials partially filled with PCP or containing PCP residue, empty vials, and rubber gloves, in addition to a bulletproof vest and a loaded .22-caliber pistol with an effaced serial number.

On September 10, 2013, the government obtained a 39-count grand jury indictment against Brown, Boston, Matthews, Adona, Hicks, and Eddie for conspiracy to distribute and to possess with the intent to distribute PCP and related offenses.

On November 5, 2014, Adona pled guilty to conspiracy to distribute and possess PCP. Under the plea agreement, Adona agreed that he had conspired with others to distribute PCP in Woodberry Village. He also admitted that he had shot a man

named Karl Carrington in the back on April 30, 2012, during a marijuana transaction. The two crimes were to be sentenced separately. In the D.C. Superior Court, Adona would be sentenced for the shooting offense. In the U.S. District Court, Adona would be sentenced for the drug conspiracy. The D.C. Superior Court sentenced Adona to two years and four months in prison. The district court sentenced Adona to nine years in prison, to be served consecutively to the sentence of imprisonment imposed by the D.C. Superior Court.

On March 24, 2015, the jury found Brown, Boston, and Matthews guilty.[1] Brown was found guilty of second-degree burglary while armed; possession with intent to distribute PCP; and possession of an unregistered firearm. Boston was found guilty of possession with intent to distribute PCP. Matthews was found guilty of unlawful possession of a firearm and ammunition.

The district court sentenced Brown to 14 years in prison; Boston to eight years in prison; and Matthews to nine years in prison.

Brown, Boston, Adona, and Matthews now appeal.

## II

Brown challenges the district court's jury instructions and his sentence.

## A

Brown challenges three aspects of the jury instructions.

---

[1] Breal Hicks and Conovia Eddie also pled guilty, but they have not appealed their sentences.

*First*, in its instructions to the jury, the district court stated that Brown had previously been convicted in the D.C. Superior Court for possession of an unregistered firearm. Brown argues on appeal that the district court erred when it informed the jury of Brown's prior firearm conviction. The problem for Brown is that he not only did not object to this instruction at trial, but he affirmatively *invited* this instruction. Brown's counsel insisted that the jury be informed of the prior conviction, presumably because of a strategic judgment in the context of all of the evidence and instructions in the case. A defendant may not complain about invited error. *See, e.g.*, *United States v. Ginyard*, 215 F.3d 83, 88 (D.C. Cir. 2000). Because Brown invited the error, he may not now complain of the error on appeal.

*Second*, Brown contends that the district court failed to give a special unanimity instruction with respect to the possession with intent to distribute PCP charge. Brown contends that jurors may have relied on different testimonial and physical evidence to conclude that he was guilty on that count. He claims that the jurors' reliance on different facts to support his conviction violates the Sixth Amendment. Brown did not raise this argument in the district court. Therefore, our review is for plain error. We need not dally on this argument. Because there is no precedent of the Supreme Court or this court requiring a district court to give a special unanimity instruction sua sponte in circumstances like those in this case, the district court's failure to do so cannot constitute plain error. *See United States v. Hurt*, 527 F.3d 1347, 1356 (D.C. Cir. 2008). Indeed, in *Hurt*, this court held that "the trial court's failure to give a special unanimity instruction *sua sponte* was not plain error," and Brown makes no argument that would distinguish his case from Hurt's. *Id.* at 1352. As a result, Brown's argument is unavailing.

*Third*, Brown contends that the burglary instruction was inadequate. The crime of burglary requires proof that the accused person entered the dwelling of another with the intent to commit an identified offense. *See* D.C. Code § 22-801(a). The district court instructed the jury that it must find that "the defendant intended to use Mr. Clifton's apartment as a place to possess and store narcotics." Trial Tr. 31 (Mar. 17, 2015). The district court further explained that Brown must have "intended to commit a crime" on the premises. *Id.* Brown contends that instruction was insufficient because it did not identify the narcotics as unlawful narcotics. We disagree. In context, the burglary instruction plainly referred to illegal drugs. Any rational juror would have easily understood that the burglary charge related to Brown's allegedly entering Clifton's apartment with the intent to store illegal drugs.

B

Brown argues that the district court, in sentencing Brown, incorrectly attributed 100 to 400 grams of PCP to him. But Brown is simply mistaken about the district court's factual finding. Brown was not sentenced for possessing more than 100 grams of PCP. He was sentenced for possessing 76.6 grams. The probation office determined that "Mr. Brown is accountable for 76.6 grams of PCP resulting in a base offense level of 20." At sentencing, the district court said that it was adopting the probation office's finding of 76.6 grams. We further know that the district court adopted the probation office's finding because a finding that Brown possessed 100 or more grams would have resulted in a base offense level of 24. A finding that he possessed 76.6 grams would mean a base offense level of 20. The district court calculated Brown's base offense level to be 20.

9

III

Marquette Boston argues that there was insufficient evidence to convict him of possession with intent to distribute PCP.

When reviewing sufficiency claims, we "accept the jury's guilty verdict" if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Andrews*, 532 F.3d 900, 903 n.1 (D.C. Cir. 2008) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (internal quotation marks omitted). We view the evidence in the light most favorable to the government. *See id.* at 904 n.1.

Boston was not found with PCP on his person, but rather near illegal drugs inside of Conovia Eddie's apartment. But the evidence tying Boston to the PCP was substantial. First, a key to Eddie's apartment was found on Boston, although he did not live there. Possession "of a key" may be "sufficient to establish constructive possession." *United States v. Dingle*, 114 F.3d 307, 311 (D.C. Cir. 1997). Second, Boston's presence inside the apartment was consistent with Little Mexico's method of operation of using others' apartments as trap houses. Third, the officers had to use a battering ram for roughly a minute to gain access to the apartment when they were not admitted after their knock and announce. *See* Trial Tr. 107 (Mar. 3, 2015 a.m.). A reasonable jury could have considered that to be evasive conduct on Boston's part indicating constructive possession of the contraband found inside the apartment. *See United States v. Dorman*, 860 F.3d 675, 680 (D.C. Cir. 2017). Fourth, the officers testified at trial that they smelled PCP coming from the bathroom. Boston was standing near the bathroom at the moment that the police entered, and the toilet had been recently flushed. Fifth, a vial containing PCP residue was found in the apartment and had

Boston's left palm print on it. Sixth, a woman named Monique Mathis testified at trial that Boston sold PCP in Woodberry Village.

Viewing all of the evidence in the light most favorable to the government, a rational jury could conclude that Boston possessed PCP and, using Eddie's apartment as a base of operations, intended to distribute PCP.

## IV

We next turn to Ira Adona's appeal. The only defendant-appellant to plead guilty, Adona raises a single challenge to his 108-month federal prison sentence. In his view, the district court should have sentenced him concurrently with, rather than consecutively to, a D.C. Superior Court sentence that stemmed from his federal guilty plea. To reach that argument, we first must determine whether Adona waived his right to this appeal. We conclude that the appeal is not barred and that the district court plainly erred in its consecutive-sentencing analysis. We therefore vacate Adona's sentence and remand for resentencing.

## A

The government contends that Adona's sentence is not subject to appeal because his plea agreement waived his right to appeal his sentence except in specified circumstances. Like all other courts of appeals, our circuit holds that a defendant "may waive his right to appeal his sentence as long as his decision is knowing, intelligent, and voluntary." *United States v. Guillen*, 561 F.3d 527, 529 (D.C. Cir. 2009). Adona's plea agreement, which he signed in April 2014, stated:

> Your client agrees to waive the right to appeal the sentence in this case, . . . and the manner in which the

sentence was determined, except to the extent the Court sentences your client above the statutory maximum or guidelines range determined by the Court, in which case your client would have the right to appeal the illegal sentence or above-guidelines sentence, but not to raise on appeal other issues regarding the sentencing.

Plea Agreement 7. Adona's sentence did not qualify under either of the specified exceptions: it was not above either the statutory maximum or the Guidelines range determined by the court. Accordingly, were we to look only at the written plea agreement, that would end the matter, and the appeal would be barred. *See United States v. Hunt*, 843 F.3d 1022, 1027 (D.C. Cir. 2016) (noting that we "ordinarily dismiss an appeal falling within the scope of [an appeal] waiver").

But although we start with the text of the plea agreement, we cannot end there: our duty to ensure that an appeal waiver is knowing, intelligent, and voluntary requires us to examine also the colloquy with the judge during which Adona entered his guilty plea. *See, e.g.*, *Hunt*, 843 F.3d at 1028-29; *United States v. Kaufman*, 791 F.3d 86, 88 (D.C. Cir. 2015); *United States v. Godoy*, 706 F.3d 493, 495 (D.C. Cir. 2013). Such plea colloquies are required by Federal Rule of Criminal Procedure 11(b), and aim "to dispel any misconceptions that the defendant may have about his likely sentence" and to correct or clarify any "erroneous information given by the defendant's attorney." *United States v. Horne*, 987 F.2d 833, 838 (D.C. Cir. 1993) (internal quotation marks omitted). The Supreme Court has admonished that Rule 11's "procedural safeguards serve[] important constitutional interests in guarding against inadvertent and ignorant waivers of constitutional rights." *United States v. Vonn*, 535 U.S. 55, 67 (2002). Accordingly, we have instructed that "courts

conducting plea colloquies must scrupulously adhere to the obligations of Rule 11." *United States v. Shemirani*, 802 F.3d 1, 3 (D.C. Cir. 2015).

As relevant to this appeal, Rule 11(b) instructs a trial court to "inform the defendant of, and determine that the defendant understands, . . . the terms of any plea-agreement provision waiving the right to appeal or to collaterally attack the sentence" before accepting a guilty plea. FED. R. CRIM. P. 11(b)(1)(N). In prior cases, we have assiduously assured compliance with this rule. Noting that "[c]riminal defendants need to be able to trust the oral pronouncements of district court judges," we have scrutinized Rule 11 colloquies to ensure that district courts accurately explain the scope of defendants' appeal waivers. *Godoy*, 706 F.3d at 495 (quoting *United States v. Wood*, 378 F.3d 342, 349 (4th Cir. 2004) (internal quotation marks omitted)). Specifically, we have examined whether "the district court mischaracterized the meaning of the waiver in a fundamental way." *Id.* If so, "the district court's oral pronouncement controls," and the "appeal is not barred." *Id.* at 496; *see Hunt*, 843 F.3d at 1028-29; *Kaufman*, 791 F.3d at 88; *United States v. Fareri*, 712 F.3d 593, 594-95 (D.C. Cir. 2013).

We focus our analysis on what the district court told Adona during the plea colloquy. When explaining to Adona the rights that his guilty plea would waive, the district court stated:

> Now, with regard to certain circumstances, you may even have an opportunity, the right to appeal the sentence of this court on the grounds of reasonableness. Do you understand that?

Adona Plea Hearing Tr. 10 (Nov. 5, 2014). Adona answered in the affirmative. *Id.*

The court's statement described a different right to appeal than that contained in the written appeal waiver. "Taken for its plain meaning – which is how criminal defendants should be entitled to take the statements of district court judges," *Godoy*, 706 F.3d at 495 – the district court's statement suggested to Adona that he could appeal a sentence he thought unreasonable. Because "the district court mischaracterized the meaning of the waiver in a fundamental way," "the district court's oral pronouncement controls," and the "appeal is not barred." *Id.* at 495-96.

The district court's statement is not saved by its conditional nature. The court's use of "may" was hardly clarifying because "may" can mean "can" as well as "might." *See* BLACK'S LAW DICTIONARY 1127 (10th ed. 2014). Nor is the statement saved by the "with regard to certain circumstances" language, which was unaccompanied by any description of what those "certain circumstances" were or were not. *See Kaufman*, 791 F.3d at 88 (vitiating plea waiver where the court initially told the defendant that he "would still have the right to appeal the sentence if [he] believe[d] the sentence is illegal," and later told him that he "might have the right to appeal, under some circumstances, if he did not 'like' the sentence"); *cf. Fareri*, 712 F.3d at 594 (vitiating appeal waiver where the district court declared, without further explanation, that the defendant "probably retain[ed] the right" to appeal certain sentences). By leaving those circumstances unexplained, the district court failed to "inform the defendant of . . . the terms of any plea-agreement provision waiving the right to appeal," as Rule 11(b) requires.

We also cannot uphold the waiver on the grounds that "reasonableness" is a "legal term of art" in the Sentencing Guidelines context. *See United States v. Ingram*, 721 F.3d 35, 43 (2d Cir. 2013) (Calabresi, J., concurring). In assessing the

adequacy of plea colloquies, we do not assume familiarity with criminal-law argot. Rather, we ask how a defendant like Adona (who left school after completing eleventh grade, Adona Plea Hearing Tr. 6) would understand the district court's pronouncement. *See Godoy*, 706 F.3d at 495. That is why, in *Godoy*, we found that the mention of a right to appeal an "illegal" sentence was misleading, even though the court's statement was technically accurate considering that "illegal sentence" is a lawyerly term of art. Here, likewise, we do not pause to parse the precise legal meaning of "reasonableness." Rather, we note that Adona surely thinks his sentence unreasonable, and that his belief is not outside the common meaning of that word.

The conclusion that the district court's plea colloquy was deficient does not end our analysis. Notwithstanding the district court's misstatement, the government contends that Adona's counsel "clarified any ambiguity" in the plea colloquy. U.S. Br. 65 n.27. To assess this claim, we turn to Adona's counsel's statement, which was as follows:

> And I've advised Mr. Adona of what Your Honor said to him in open court prior to this, that Your Honor . . . would consider the advisory guidelines, but your inclination was that that – the court would probably depart upward and would state the reasons for that. I've explained to Mr. Adona, and I think Your Honor just went over briefly with him earlier, that under the plea agreement he retains the right to appeal that decision and – if Your Honor does do that.

Adona Plea Hearing Tr. 14.

We need not decide whether or under what circumstances a statement by defense counsel may cure a district court's mischaracterization of a plea waiver because counsel's

statement did not do so in this case. Contrary to the government's contention, Adona's counsel did not state "that Adona would retain the right to appeal *only* if the district court sentenced him to an above-guidelines sentence." U.S. Br. 65 n.27 (emphasis added). Instead, Adona's counsel merely told him that he retained the right to appeal an above-Guidelines sentence, without suggesting that was the only category of sentence he could appeal. Indeed, that was *not* the only category of sentence he could appeal, even under the written plea agreement – which permitted him also to appeal a sentence "above the statutory maximum." Plea Agreement 7. Accordingly, because counsel's statement made no effort to mark the metes and bounds of appealable sentences, it did nothing to inform Adona of the true scope of his appeal waiver.

Nor did the government say anything to clarify or correct the record – despite our recent admonition that "the United States Attorney's Office would be well advised to develop instructions and training for its attorneys to make it part of their routine practice to help ensure that district courts fulfill each of the requirements of Rule 11 . . . when a defendant enters a plea." *Shemirani*, 802 F.3d at 3. Had the government immediately corrected the record, it could have preserved its appeal waiver and obviated the need for the past several pages of this opinion. Because it did not, we now proceed to addressing the merits of Adona's appeal.

B

Adona raises a number of arguments about the district court's decision to sentence him consecutively to, rather than concurrently with, his Superior Court sentence. Only one of them, which concerns the district court's failure to take into account Section 5G1.3(b) of the United States Sentencing Guidelines, has merit. Because Adona failed to assert this

argument in the district court, we review it for plain error only. *United States v. Andrews*, 532 F.3d 900, 908 (D.C. Cir. 2008). Under that standard, "[t]here must be (1) error, (2) that is plain, and (3) that affect[s] substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)); *see United States v. Olano*, 507 U.S. 725, 731-36 (1993).

1

The district court accepted Adona's plea agreement in November 2014. As part of his guilty plea, Adona admitted to conspiring to distribute and possess PCP, in violation of 21 U.S.C. §§ 841, 846. He proffered that he "knowingly and intentionally distributed PCP in vials and cigarette 'dippers,'" that he "kept, stored, shared, and maintained firearms" within Woodberry Village, and that he undertook these activities in conspiracy with his five co-defendants. Plea Agreement 14.

The agreement also required Adona to plead guilty to a D.C. Superior Court charge of attempted assault with a dangerous weapon, in violation of 22 D.C. Code §§ 402, 1803. That charge stemmed from Adona's shooting of Karl Carrington, who had attempted to purchase marijuana from Adona. Plea Agreement 15.

Prior to entering Adona's plea, the district court made clear that it would accept the deal only on the condition that Adona would "be sentenced and plead first in Superior Court." Adona Status Conf. Tr. 6 (Oct. 7, 2014). This requirement, the court explained, was so "I have the option, which I will exercise, to sentence [Adona] consecutively." *Id.* The district court announced in the same hearing that Adona's

"guideline range is not proportionate to the seriousness of [his] conduct," and that Adona "should know going in, that there is not much, if any, likelihood that there will be a sentence from this Court within the guideline range." *Id.* at 5-6.

On October 29, 2014, pursuant to the plea agreement, Adona pled guilty to the attempted assault charge in Superior Court. On January 30, 2015, the court sentenced Adona to 28 months' imprisonment on that charge.

Adona's shooting of Carrington also affected the calculation of his federal Guidelines range. The Probation Office's pre-sentence investigation report (PSR) recited that Adona "shot Mr. Karl Carrington in the back."[2] It therefore recommended that Adona's offense level be "enhanced two levels because of his use of violence" in related conduct. Adona PSR 15; *see* U.S.S.G. § 2D1.1(b)(2).

In a July 2015 presentencing hearing, Adona's counsel protested the consequences of the use-of-violence enhancement. He asked the district court to "take into consideration" the 28-month Superior Court sentence, noting that it penalized the same behavior as did the use-of-violence enhancement. Adona Status Hearing Tr. 34 (July 28, 2015). Specifically, he argued, the district court should run the portion of its sentence that stemmed from the use-of-violence enhancement concurrently with the Superior Court sentence. Otherwise, counsel contended, Adona would be "punished twice." *Id.* at 35.

---

[2] The PSR was filed under seal. "Insofar as we refer to information derived from the PSR, it is unsealed to the limited extent referenced in this opinion, although the full document shall remain physically withheld from public review." *United States v. Reeves*, 586 F.3d 20, 22 n.1 (D.C. Cir. 2009).

The district court initially seemed amenable to this argument. Declaring that Adona's counsel made a "good point," and that the use-of-violence enhancement could be "punishing [Adona] twice for the same thing," the court queried whether it should simply drop the enhancement altogether:

> So why wouldn't the prudent thing to do for a judge in this situation is to not give him the two points for violence, take that issue off the table for any appeal down the road . . . . I have plenty of discretion with regard to consecutive sentenc[ing] for the shooting over in the Superior Court. Why create the issue? Why create legal problems when I don't need to?

*Id.* at 36, 38. Eventually, however, the court decided to accept the use-of-violence enhancement – but not before Adona's counsel again asked the court to "take into consideration" the double-counting issue, and not before the district court responded, "I absolutely will. You have my commitment to that . . . ." *Id.* at 40.

We come, finally, to the sentencing hearing itself, where Adona's counsel again requested a partially concurrent sentence. At this hearing, however, the district court was less receptive, stating, "You've heard the Court speak about consecutive sentence[s]. Obviously, you know it's going to be a consecutive sentence to what happened over in the Superior Court." Adona Sentencing Hearing Tr. 24 (Sept. 29, 2015). Accordingly, the court ordered Adona to serve 108 months' incarceration (the top of the Sentencing Guidelines range), to run consecutively to his Superior Court sentence.

2

In general, Congress affords the courts discretion in deciding whether to sentence defendants convicted of multiple crimes concurrently or consecutively. Regardless of whether "multiple terms of imprisonment are imposed on a defendant at the same time" or "a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment," the district court may assign a sentence to "run concurrently or consecutively." 18 U.S.C. § 3584(a). Congress instructs judges deciding this question to consider the same factors, enumerated in 18 U.S.C. § 3553(a), that bear on the length of a defendant's sentence. *Id.* § 3584(b). Those factors include the nature of the offense, the history of the defendant, and – crucially for this case – the Guidelines issued by the United States Sentencing Commission. *Id.* § 3553(a)(1), (4).

The Guideline that is relevant here is U.S.S.G. § 5G1.3, "Imposition of a Sentence on a Defendant Subject to an Undischarged Term of Imprisonment or Anticipated State Term of Imprisonment." Section 5G1.3, which "operates to mitigate the possibility that the fortuity of two separate prosecutions will grossly increase a defendant's sentence," *Witte v. United States*, 515 U.S. 389, 405 (1995), provides in relevant part:

> (b) If . . . a term of imprisonment *resulted from another offense that is relevant conduct to the instant offense* of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of § 1B1.3 (Relevant Conduct), the sentence for the instant offense shall be imposed as follows:
>
> . . . .

> (2) the sentence for the instant offense *shall be imposed to run concurrently* to the remainder of the undischarged term of imprisonment.

U.S.S.G. § 5G1.3(b) (emphasis added).

The government does not dispute that the district court treated Adona's Superior Court term of imprisonment for assault as having "resulted from another offense that is relevant conduct to the instant offense of conviction," *i.e.*, the federal drug charge. *See* U.S. Br. 72 ("The Carrington shooting . . . was 'relevant conduct' for the purposes of Adona's conspiracy sentencing."). Otherwise, the district court could not have taken the Carrington shooting into account when assigning a use-of-violence enhancement, and we would be presented with a different (although equally plain) Sentencing Guidelines error. *See* U.S.S.G. § 1B1.3(a) (providing that, in determining Guidelines enhancements, the sentencing court may only take into account relevant conduct); *United States v. Mellen*, 393 F.3d 175, 182 (D.C. Cir. 2004) (same). Accordingly, "the sentence for the instant offense" should have been "imposed to run concurrently to the remainder of the undischarged term of imprisonment." U.S.S.G. § 5G1.3(b)(2); *see United States v. Nania*, 724 F.3d 824, 830-34 (7th Cir. 2013). This conclusion follows inexorably from the text of § 5G1.3(b), and the government does not disagree.

"Of course, given the advisory nature of the Sentencing Guidelines, a district court has no obligation to impose a concurrent sentence, even if § 5G1.3(b) applies." *Nania*, 724 F.3d at 830; *see United States v. Booker*, 543 U.S. 220, 245 (2005). But a court must nonetheless "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007); *see Booker*, 543 U.S. at 264 (requiring sentencing courts to

"consult" and "take . . . into account" the Guidelines).   The district court did not do so here.

3

Because the district court did not acknowledge that the Guidelines recommended a concurrent sentence, it improperly applied the Guidelines.   That misapplication was error.

Moreover, the court's error was "plain" – that is, "clear" or "obvious."   *Olano*, 507 U.S. at 734.   The government does not contest this prong of the plain-error analysis either, and for good reason: "failing to calculate (or improperly calculating) the Guidelines range" is "significant procedural error," *Gall*, 552 U.S. at 51, that rises to the level of plain error, at least where the text of the Guidelines is clear.

That error prejudiced Adona.   As the Supreme Court recently explained, "[w]hen a defendant is sentenced under an incorrect Guidelines range[,] . . . the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error."   *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345 (2016).   "Indeed," the Court continued, "in the ordinary case a defendant will satisfy his burden to show prejudice by pointing to the application of an incorrect, higher Guidelines range and the sentence he received thereunder.   Absent unusual circumstances, he will not be required to show more."   *Id.* at 1347; *see United States v. Burnett*, 827 F.3d 1108, 1121 (D.C. Cir. 2016).

The government contends that unusual circumstances are present here.   It asserts that the district court "made clear" that it planned to sentence Adona to a "lengthy, and consecutive," sentence.   U.S. Br. 70 (citing Adona Sentencing Hearing Tr. 15, 24).   Accordingly, in its view, "Adona could not show that, had the court expressly considered § 5[G]1.3(b), it would have

run part of the federal sentence concurrently instead." *Id.*

The government's argument misstates the standard for prejudice. In the sentencing context, a defendant need not show that a sentence *would* have issued differently but for the district court's plain error. He need demonstrate only a "reasonable likelihood that the sentencing court's obvious errors affected his sentence." *United States v. Saro*, 24 F.3d 283, 288 (D.C. Cir. 1994); *see Molina-Martinez*, 136 S. Ct. at 1343. The statements of the district court that the government cites hardly preclude a reasonable likelihood of a different result – especially because the government omits to mention the district court's various statements, noted above, indicating that it was willing to consider the double-counting problem. *See* Adona Status Hearing Tr. 36, 38, 40.

Finally, having concluded that Adona has demonstrated an error that was clear and that affected his substantial rights, we exercise our discretion to correct the district court's plain error. "We have repeatedly opted to correct plain sentencing errors that, if left uncorrected, would result in a defendant serving a longer sentence." *In re Sealed Case*, 573 F.3d 844, 853 (D.C. Cir. 2009); *United States v. Coles*, 403 F.3d 764, 767 (D.C. Cir. 2005) ("[I]t is a miscarriage of justice to give a person an illegal sentence that increases his punishment . . . ." (quoting *United States v. Paladino*, 401 F.3d 471, 483 (7th Cir. 2005)). We therefore vacate Adona's sentence and remand for resentencing. On remand, the district court must consider – but is not bound by – the guidance of § 5G1.3(b).

V

The government obtained a wide-ranging indictment that charged the then-22-year-old Keith Matthews with twenty-two

criminal counts, including conspiracy, drug, firearms, extortion, assault, kidnapping, and robbery offenses. By trial, the government had lost or abandoned all but eight of those charges. The jury ultimately acquitted Matthews of each remaining offense, save one: unlawful possession of a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1).

Matthews does not challenge his conviction for that single offense, only his sentence. The district court agreed with the Probation Office that the relevant Sentencing Guidelines range was 78 to 97 months. After studying the characteristics of Matthews' criminal conduct and his background, the Probation Office specifically determined that nothing warranted an upward variance in Matthews' case. Nevertheless, the district court sentenced Matthews to 108 months of imprisonment, a 38% increase above the lower portion of the range and an 11% increase above the very top of the range.

Matthews challenges both the district court's calculation of the Guidelines range and its imposition of an above-Guidelines sentence. We review a sentencing court's determinations in two steps, asking first whether the court committed procedural error in calculating the defendant's sentence, and next whether the sentence imposed was substantively reasonable. *In re Sealed Case*, 527 F.3d 188, 190-191 (D.C. Cir. 2008). We hold that the district court properly calculated Matthews' Sentencing Guidelines range, but it failed to explain adequately its variance from that range. For that reason, we vacate Matthews' sentence and remand for resentencing.

24

A

We review *de novo* the district court's interpretation of the Sentencing Guidelines in calculating a defendant's Sentencing Guidelines range. *In re Sealed Case*, 548 F.3d 1085, 1090 (D.C. Cir. 2008).

For felon-in-possession offenses, a defendant's base offense level turns on numerous factors including, as relevant here, the defendant's prior criminal history. If the defendant has "one [prior] felony conviction of either a crime of violence or a controlled substance offense" and the offense involves a firearm of the type described in 26 U.S.C. § 5845(a), the defendant receives a base offense level of 22. U.S.S.G. § 2K2.1(a)(3). If the defendant does not have such a qualifying prior conviction, he receives a base level of either 18 or 20, depending on the presence of other aggravating factors. *Id.* § 2K2.1(a)(5).[3]

In computing Matthews' Guidelines range for his unlawful possession of a firearm, the district court concluded that Matthews' conviction five years earlier for attempted assault with a dangerous weapon under District of Columbia law, 22 D.C. Code § 402, qualified him for a "crime of violence" enhancement under Guidelines Section 2K2.1(a)(3). That

---

[3] More specifically, Section 2K2.1(a)(3) provides that the defendant's "Base Offense Level" will be: "22, if (A) the offense involved a (i) semiautomatic firearm that is capable of accepting a large capacity magazine; or (ii) firearm that is described in 26 U.S.C. § 5845(a); and (B) the defendant committed any part of the instant offense subsequent to sustaining one felony conviction of either a crime of violence or a controlled substance offense[.]"

determination increased Matthews' base offense level by four points from 18 to 22.   U.S.S.G. § 2K2.1(a)(3) (2014).[4]

Matthews argues that attempted assault with a dangerous weapon does not qualify as a "crime of violence," and for that reason his base offense level should have been four points lower and his sentencing range reduced to 51 to 63 months. But settled circuit precedent establishes that Matthews' earlier conviction falls within the elements clause, and so the district court properly applied the offense-level adjustment in calculating Matthews' Sentencing Guidelines range.

The Guidelines that governed Matthews' sentencing defined a "crime of violence" as "any offense" punishable by a year or more of imprisonment that

(i)    "has as an element the use, attempted use, or threatened use of physical force against the person of another,"

(ii)    "is burglary of a dwelling, arson, or extortion, involves use of explosives," or

(iii)    "otherwise involves conduct that presents a serious potential risk of physical injury to another."

U.S.S.G. § 4B1.2(a) (2014).   That first criterion for qualifying as a crime of violence is known as the "elements" clause.   The second is often described as the "enumerated offense" provision.   And the third has been labeled the "residual" clause.

---

[4] These calculations are based on the November 2014 Sentencing Table, the matrix in effect at the time of Matthews' sentencing.

To determine whether Matthews' prior conviction for attempted assault with a dangerous weapon qualifies under the elements clause, the district court properly applied the "categorical approach" and asked whether the elements of attempted assault with a dangerous weapon necessarily require "the use, attempted use, or threatened use" of "violent" force. *Johnson v. United States*, 559 U.S. 133, 136, 140, 145 (2010); *United States v. Castleman*, 134 S. Ct. 1405, 1413 (2014). That analysis looks only to the elements of the crime to determine whether, by its terms, commission of the crime inherently (*i.e.*, categorically) requires the kind of force "capable of causing physical pain or injury to another person" in all cases. *Johnson*, 559 U.S. at 140. If it is possible to commit the crime without the use, attempted use, or threatened use of violent force, the offense-level enhancement does not apply, regardless of whether the defendant's actual conduct in perpetrating the offense would individually qualify. *See Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016) (holding that courts generally may not look to the facts of a defendant's conviction when applying the categorical approach).

The relevant District of Columbia Code provision casts little informative light on the elements of the crime of attempted assault with a deadly weapon. *See* 22 D.C. Code § 402. But case law has identified its elements as: (1) "an attempt, with force or violence, to injure another, or a menacing threat, which may or may not be accompanied by a specific intent to injure;" (2) "the apparent present ability to injure the victim;" (3) a general "intent to commit the acts which constitute the assault;" and (4) "the use of a dangerous weapon in committing the assault." *Spencer v. United States*, 991 A.2d 1185, 1192 (D.C. 2010) (internal quotation marks omitted).

Given that fourth element – the required use of a dangerous weapon – circuit precedent forecloses Matthews' argument that attempted assault with a deadly weapon is not a crime of violence within the meaning of the elements clause, U.S.S.G. § 4B1.2(a)(1) (2014). In *United States v. Redrick*, 841 F.3d 478 (D.C. Cir. 2016), this court had "little difficulty" in concluding that the parallel offense of armed robbery under Maryland law "contains as an element the use, attempted use, or threatened use of physical force against the person of another" precisely because of its requirement that the defendant commit the crime with the use of a dangerous or deadly weapon. *Id*. at 484 (internal quotation marks omitted). Specifically, the court ruled that the offense of robbery is an offense against an individual, and that the use of a dangerous weapon as part of that crime transformed the threat of force present in simple robbery into a threat of *violent* force. *Id.* ("Certainly the additional element of 'use' of a dangerous or deadly weapon supplies at minimum a 'threat' of physical force against the person of another. And because the means employed is a 'dangerous or deadly weapon,' the required degree of force – that is, '*violent* force' – is present.") (emphasis in original).[5]

So too here. Assault is an offense against an individual, and adding a dangerous weapon into the mix makes the crime an inherently violent one. Use of that weapon as part of the crime materially increases the risk that violence will ensue.

---

[5] Matthews does not suggest that his offense falls outside the crime of violence definition because it allows for a *mens rea* of recklessness. *Cf. Voisine v. United States*, 136 S. Ct. 2272, 2278 (2016) (holding that a "reckless domestic assault qualifies as a misdemeanor crime of violence" under the use-of-force provision).

To be sure, Matthews was convicted of attempt, rather than the substantive assault crime itself. But that is a distinction without a difference. The use-of-force clause refers explicitly to offenses that have as an element "the . . . *attempted use . . .* of physical force against the person of another." U.S.S.G. § 4B1.2 (emphasis added). Linking to that text, the commentary to the Sentencing Guidelines specifically states that a crime of violence "include[s] the offenses of aiding and abetting, conspiring, and attempting to commit such offenses." U.S.S.G. § 4B1.2, cmt. 1; *see United States v. Winstead*, __ F.3d __, No. 12-3036, 2018 WL 2372193, at * 8 (D.C. Cir. May 25, 2018) (citing the crime-of-violence definition for the proposition that the Sentencing Commission "knows how to include attempted offenses when it intends to do so"); *see also James v. United States*, 550 U.S. 192, 198 (2007) (observing that the "attempted use" language of the Armed Career Criminal Act's similarly worded elements clause demonstrated "Congress' inclusion of attempt offenses").

Matthews, moreover, does not argue that D.C. "attempt" differs from generic attempt in any way that would place it outside the Guidelines' commentary. Nor does he contend that including his attempt offense as the commentary indicates would "violate[] the Constitution or a federal statute, or [be] inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993).[6]

Instead, Matthews contends that D.C.'s attempted assault with a dangerous weapon is more akin to Massachusetts' law governing robbery with a dangerous weapon, a crime that the

---

[6] *Winstead*, in any event, would foreclose such a belated challenge by Matthews. *See Winstead*, __ F.3d at __, No. 12-3036, 2018 WL 2372193, at * 6 ("[W]e would not reverse the district court's decision on the guidelines issue under [the plain error] standard.").

Ninth Circuit has held does not categorically require the use or threat of violent force. *See United States v. Parnell*, 818 F.3d 974 (9th Cir. 2016). But Massachusetts' offense requires only the *possession* of a dangerous weapon, not its *use*. *Id.* at 980. "[B]y two oddities of Massachusetts law," the crime of robbery with a dangerous weapon covers robberies that do not involve "violence or intimidation of any sort," including in situations where the weapon is present but plays no role in the offense itself. *Id.* at 982 (Watford, J., concurring). By contrast, assault with a dangerous weapon under District of Columbia law requires both intimidation and the actual use of a dangerous weapon. *See Spencer*, 991 A.2d at 1192 (listing "the use of a dangerous weapon in committing the assault" as an element of the offense).

The District of Columbia cases that Matthews cites show only that the victim need not subjectively know that the defendant is using a dangerous weapon; the requirement that the defendant "use" the weapon – and thus that the firearm play an actual role in the offense – remains. *See, e.g.*, *Parks v. United States*, 627 A.2d 1, 6 (D.C. 1993) (upholding assault with a dangerous weapon conviction where the defendant reached for a gun and raised it to his knee without the officer's awareness). Even when the victim is unaware that the perpetrator has a dangerous weapon, the defendant's use or attempted use of a weapon for his own purposes during the crime creates a serious threat that physical violence will result.

In sum, a straightforward application of *Redrick* to Matthews' case confirms that the district court properly set Matthews' base offense level at 22 because of his prior

conviction for attempted assault with a dangerous weapon under D.C. law.[7]

B

With circuit precedent this time at his back, Matthews fares much better on his claim that the district court failed adequately to explain his above-Guidelines sentence.

Ordinarily, we review asserted procedural error in a sentencing decision for an abuse of discretion. *See In re Sealed Case*, 527 F.3d at 190. But because Matthews raised this issue for the first time on appeal, we will reverse only for plain error. *United States v. Mahdi*, 598 F.3d 883, 888 (D.C. Cir. 2010). Accordingly, Matthews bears the burden of showing that the district court committed an error that is plain, affects his substantial rights, and "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

Thrice before, this court has held that an inadequately explained and insufficiently particularized upward variance constitutes plain error. *See, e.g.*, *United States v. Brown*, 808 F.3d 865, 867, 872 (D.C. Cir. 2015); *United States v. Akhigbe*, 642 F.3d 1078, 1086 (D.C. Cir. 2011); *In re Sealed Case*, 527 F.3d at 191-192. Today marks the fourth time.

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the

---

[7] Because Matthews' conviction qualifies as a crime of violence under the elements clause of U.S.S.G. § 4B1.2 (2014), we need not wrestle with the language of the residual clause. (We note that the Sentencing Commission has since removed the residual clause. *See* U.S.S.G., Supp. App. C, Amdt. 798 (effective Aug. 1, 2016)).

human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (citation omitted). Accordingly, to sustain an upward variance, the district court must undertake an individualized assessment of the defendant's particular offense and characteristics, and then "must state the specific reason why the defendant's conduct was more harmful or egregious than the typical case represented by th[e] [relevant Sentencing Guidelines] range." *Brown*, 808 F.3d at 867 (internal quotation marks and alterations omitted). And Congress has commanded that the sentencing court must state such reasons "with specificity." 18 U.S.C. § 3553(c). The court cannot satisfy that requirement with generic recitations of the sentencing factors, but rather must articulate "why the court believe[s]" that an above-Guidelines sentence is appropriate "for this particular defendant." *Akhigbe*, 642 F.3d at 1086. In addition, when a court deviates from the Guidelines, it must provide an explanation "sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

Because the duty to provide the required individualized explanation is settled law, a district court's failure to spell out its reasoning constitutes plain error. That error, moreover, affects the defendant's substantial rights and implicates the fairness and integrity of the justice system because it precludes meaningful appellate review. *See Akhigbe*, 642 F.3d at 1087-1088 ("The district court's failure to explain adequately the sentence it imposed is prejudicial in itself because it precludes appellate review of the substantive reasonableness of the sentence, thus seriously affecting the fairness, integrity, or public reputation of judicial proceedings.") (internal quotation marks and alterations omitted). This is true even if the length of the sentence imposed "would otherwise be reasonable." *In re Sealed Case*, 527 F.3d at 193 (internal quotation marks

omitted). Appellate courts, after all, cannot evaluate the reasonableness of the unexplained.

In analyzing the sufficiency of the district court's decision, we must first take account of what considerations were already built into Matthews' recommended Guidelines range. That is because an upward variance is not supposed to reduplicate punishment already meted out by the Guidelines' range itself. *See Brown*, 808 F.3d at 872 (noting that "the applicable category of offense committed by the applicable category of defendant . . . provides the bench mark for assessing whether criminal behavior merits an upward variance"). So when choosing an above-Guidelines sentence, it is critical that the district court explain why the otherwise applicable Guidelines calculation "does not fully account for the described criminal conduct." *Id.* And, as the Supreme Court recently reminded, the district court must do so "with specificity." *Hughes v. United States*, __ U.S. __, No. 17-155, 2018 WL 2465187, at * 6 (June 4, 2018).[8]

Matthews was convicted of unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)(1). In calculating the appropriate Guidelines range, the court enhanced Matthews' base offense level by two points for the possession of multiple firearms, U.S.S.G. § 2K2.1(b)(1)(A), and (as noted above) by four points for the use of an unlawful firearm in conjunction with a prior crime of violence, *id.* § 2K2.1(b)(6)(B). Those enhancements almost doubled the

---

[8] As the Supreme Court just reiterated, that duty to articulate the grounds for an above-Guidelines sentence with particularity is fully consonant with the "advisory only" nature of the Sentencing Guidelines. *Hughes*, 2018 WL 2465187, at * 5. Insisting on such reasoned explanation is a far cry from making the Guidelines "talismanic." Dissenting Op. at 5.

applicable sentencing range (from 51-63 months to 97-121 months). A two-point deduction for acceptance of responsibility then brought Matthews' final range down to 78-97 months – a range still well-above the 51-63 months dictated by his base offense level.

The district court concluded that the resulting Guidelines range of 78 to 97 months, which the Probation Office had expressly endorsed, was too low because Matthews was involved in "drug dealing," "some related acts of violence," and he "had a lot of weapons." Matthews Sentencing Hearing Tr. 27-28 (Sept. 1, 2015). But, as the Probation Office's calculations reflect, Matthews' Guidelines range already specifically accounted for those same factors by adding 46 to 58 months to his sentencing range through the six-point enhancements of his base offense level. At no point did the district court find or explain why that nearly 50% increase in Matthews' sentencing range was not enough punishment for that same conduct. Nor did the district court identify any way in which Matthews' conduct "was more harmful or egregious" than the mine run of defendants facing those same enhancements. *Brown*, 808 F.3d at 866-867.

The district court's remaining reasons amount to little more than a recitation of the Section 3553(a) factors without any individualized "application to the defendant being sentenced." *Brown*, 808 F.3d at 871 (citing *Akhigbe*, 642 F.3d at 1086). Specifically, the court referenced a need "to deter" Matthews and others from engaging in this kind of conduct, to "protect the community," and "to promote respect for the law." Matthews Sentencing Hearing Tr. 28-29.

Reciting the statutory factors is where the sentencing calculus should start, not where it should end. Yet nothing in the court's decision tied those generic sentencing factors to

anything distinctive about Matthews' crime or background that would warrant increasing his sentence beyond the punishment already captured by all the elements that went into his individual Guidelines calculation. As it stands, the district court's decision is devoid of the "individualized reasoning" necessary to understand why the court felt an upward variance "was appropriate for this particular defendant" in a way that it would not be for others to whom the same drug and firearms enhancements are applied. *Akhigbe*, 642 F.3d at 1086.

The dissenting opinion asks only whether Matthews is a more serious *felon-in-possession* than any other "ordinary felon in possession." Dissenting Op. at 8; *see id*. at 9. That overlooks that Matthews' sentencing range already accounts for certain aggravating aspects of his firearm possession – specifically, the number of weapons he possessed (two points) and the fact that he possessed a firearm in conjunction with other criminal activity (four points). To justify an upward variance, the district court had to differentiate Matthews from other defendants within the same heightened Guidelines range, not just other defendants convicted of the same crime. *See Brown*, 808 F.3d at 872; *see also Hughes*, 2018 WL 2465187, at * 9 (federal law aims to ensure that "those who commit crimes of similar severity under similar conditions receive similar sentences") (quoting *Freeman v. United States*, 564 U.S. 522, 533 (2011) (plurality opinion)).

Lastly, the district court said that it wanted to make an example out of Matthews. Matthews Sentencing Hearing Tr. 29 ("And I'm [varying upwards] symbolically to make a point, that it's important that the people in the community, that you and others see that this kind of conduct has to stop, that you need to be deterred, they need to be deterred, and that the community, of course, needs to respect the law, and you need to respect the law."). But we are never told why Matthews,

out of all offenders in the community, was singled out for such messaging.  The district court is silent about that.  For all the record shows, nothing marks Matthews out as peculiarly deserving of even more punishment than the enhancements already imposed or as presenting a particularly potent symbol to other would-be offenders.   Indeed, the Probation Office was explicit that it "had not identified any factors that would warrant a variance from the applicable guideline range based on the factors outline[d] in 18 U.S.C. § 3553(a)."   Matthews PSR 10.  Without any individualized reasoning, the decision just to pick one defendant out for the systemic value of making an example of him is the polar opposite of individualized sentencing.

In short, at no point did the district court's sentencing colloquy offer the specific reason or reasons "why [it] found [Matthews'] conduct more harmful or egregious than the typical case accounted for in the properly calculated Guidelines range."  *Brown*, 808 F.3d at 871 (internal quotation marks and alterations omitted).  Just as in *Brown*, the court's "spare and unparticularized" characterizations of Matthews' conduct "closely track[ed] the code provision to which [he] pled, . . . and two of the specific offense characteristics included in his Guidelines calculation."   808 F.3d at 872.   This court's precedent requires more.

As in *Brown*, *Akhigbe*, and *In re Sealed Case*, the court's written statement of reasons is even less illuminating than the in-court sentencing colloquy.  *See Brown*, 808 F.3d at 874; *Akhigbe*, 642 F.3d at 1087; *In re Sealed Case*, 527 F.3d at 192.  That is because there is no actual written statement.  In the section of the sentencing form directing the court to "[e]xplain the facts justifying a sentence outside the advisory guideline

system," the form is completely blank. Matthews Statement of Reasons 3.[9]

The dissenting opinion identifies three concerns "one might have about the sentence in this case," and then submits that, because "all three are policy-based," they "do not qualify as legal grounds for vacating the sentence." Dissenting Op. at 12. We agree. The vacatur of Matthews' sentence rests exclusively on binding circuit precedent, not policy.

The dissenting opinion next accuses the court of conflating substantive and procedural reasonableness. Dissenting Op. at 10, 14. Not so. The failure to provide a sufficient explanation for an above-Guidelines sentence is a procedural failing, not a substantive one. *Brown*, 808 F.3d at 867 ("Brown also argues that the District Court's explanation of the above-Guidelines sentence was insufficient *as a procedural matter* under § 3553(c)(2). We agree.") (emphasis added); *Akhigbe*, 642 F.3d at 1087 ("In *In re Sealed Case*, we found plain *procedural error* where the district court imposed an

---

[9] Because both the court's oral and written statements lack the requisite specificity, we need not address whether a flawed written statement alone would warrant remand. *See Brown*, 808 F.3d at 874 (holding that the in-court and written statements "both are clearly insufficient and independently amount to plain error"); *see also* 18 U.S.C. § 3742(f) ("If the court of appeals determines that . . . the sentence is outside the applicable guideline range and the district court failed to provide the required statement of reasons in the order of judgment and commitment . . . it shall . . . set aside the sentence and remand the case for further sentencing proceedings."); *cf. United States v. Jackson*, 848 F.3d 460, 465 (D.C. Cir. 2017) (refraining from deciding whether a deficient written statement may "ever affect the validity of an otherwise valid sentence," but concluding that the written deficiencies at issue did not affect the defendant's "substantial rights").

above-Guidelines sentence 'without providing any explanation at all' in open court and also submitted no written statement of reasons.") (emphasis added). And under settled circuit law, imposing differentially harsh punishment without any differentiating reason is plain error, since dispensing with reasoned explanation eliminates meaningful appellate review. *See id.*

The law's demand that a court explain why a defendant is treated more harshly than other similarly situated defendants safeguards a fundamental component of justice: parity in criminal sentencings. *See United States v. Booker*, 543 U.S. 220, 250 (2005) ("Congress' basic statutory goal – a system that diminishes sentencing disparity – depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); *see also Hughes*, 2018 WL 2465187, at * 5 (sentencing courts "need to avoid unwarranted sentencing disparities"). That aspect of the process broke down in this case.

## VI

For the foregoing reasons, we affirm Dawayne Brown's conviction and sentence and Marquette Boston's conviction. We vacate the sentences of Ira Adona and Keith Matthews and remand for resentencing.

*So ordered.*

MILLETT, *Circuit Judge*, concurring: I write separately to put an exclamation on a point I have previously expressed: the constitutionally troubling use of *acquitted* conduct as the specific basis for increasing a defendant's prison sentence above the Sentencing Guidelines range. "In a constitutional system that relies upon the jury as the great bulwark of our civil and political liberties," allowing courts at sentencing "to materially increase the length of imprisonment" based on conduct for which the jury acquitted the defendant guts the role of the jury in preserving individual liberty and preventing oppression by the government. *United States v. Bell*, 808 F.3d 926, 929–930 (D.C. Cir. 2015) (Millett, J., concurring in the denial of rehearing en banc) (internal quotation marks, citations, and alterations omitted); *see also id.* at 928 (Kavanaugh, J., concurring in the denial of rehearing en banc).

Keith Matthews' sentence provides yet another living example of this problem. The government charged Matthews with twenty-two counts of serious criminal conduct, including assault, extortion, kidnapping, first-degree burglary while armed, and a mélange of other drug- and violence-related offenses. When Matthews pushed back by exercising his constitutional right to a jury trial, the government's indictment collapsed like a house of cards. The district court dismissed eight of the charges as so insubstantial that no rational juror could vote to convict. *See* Fed. R. Crim. P. 29(a); *United States v. Boyd*, 803 F.3d 690, 691–692 (D.C. Cir. 2015). For six others, the government surrendered without a fight, expressly declining even to present them to a jury. By the time Matthews' case reached the jury, his twenty-two counts had dwindled to eight.

For seven of those remaining eight charges, the government put on its best case. And it lost, hands down. The jury acquitted Matthews of every single tried charge except one: unlawful possession of firearm as a felon in violation of 18 U.S.C. § 922(g)(1). As our Constitution designed, the

People—a jury of Matthews' peers—spoke loudly and clearly: the only criminal conduct for which the government could imprison Matthews was the unlawful possession of a single firearm.

Unfortunately for Matthews, circuit precedent allowed the government a second bite at the incarceration apple. The government acknowledged at sentencing that Matthews "was not convicted of" assaulting and burglarizing another Woodberry resident. But let's punish him anyhow, the government urged, for exactly that acquitted conduct. Dkt. 402 at 11–12 ("We understand the jury's verdict, but we also understand that the Guidelines Range did not take into account the factual evidence that this man was involved[.]"). The government, it seems, did not understand what the jury meant when it said "not guilty."

To be sure, many considerations at criminal sentencing, like the defendant's background, criminal history, and other mitigating or aggravating factors, need only be proved by a preponderance of the evidence. But lumping acquitted conduct in with those traditional factors *and* then using that acquitted conduct to single a defendant out for distinctively severe punishment—an above-Guidelines sentence—renders the jury a sideshow. Without so much as a nod to the niceties of constitutional process, the government plows ahead incarcerating its citizens for lengthy terms of imprisonment without the inconvenience of having to convince jurors of facts beyond a reasonable doubt.

Incarceration without conviction is a constitutional anathema. *Bell*, 808 F.3d at 932 (Millett, J., concurring in the denial of rehearing en banc). Our constitutional system of government reposes ultimate power in the People of the United States to preserve and maintain liberty. The ultimate threat to

liberty and rule of the People, by the People, and for the People is the power of the government to lock up and exercise complete control over its citizens. The genius of the Constitution's protections for criminal defendants was to prevent tyranny in that form by ensuring that an individual's liberty could only be stripped away by a jury of his peers upon proof of a crime beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 362 (1970) (holding that these "rules are historically grounded rights of our system, developed to safeguard men from dubious and unjust convictions") (internal quotation marks omitted); *id*. at 363 ("The [reasonable-doubt] standard provides concrete substance for the presumption of innocence—that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.'"). Allowing the government to lock people up for a discrete and identifiable term of imprisonment for criminal charges rejected by a jury is a dagger pointed at the heart of the jury system and limited government.

I acknowledge that circuit precedent allows the government to engage in this acquitted-conduct alchemy. *See United States v. Settles*, 530 F.3d 920 (D.C. Cir. 2008). But I do not have to like it or stay silent about what is, in my view, a grave constitutional wrong.

KAVANAUGH, *Circuit Judge*, dissenting in part: The majority opinion vacates the sentences of defendants Adona and Matthews. I respectfully dissent on those two issues. I would dismiss Adona's appeal based on the appeal waiver in his plea agreement. I would affirm Matthews' sentence as procedurally and substantively reasonable.

I

Ira Adona pled guilty to conspiracy to distribute PCP. The written plea agreement included an appeal waiver. As relevant here, the appeal waiver provided that Adona could appeal his sentence only if his sentence was *above* the Guidelines range determined by the District Court. The appeal waiver stated quite clearly:

> Your client agrees to waive the right to appeal the sentence in this case, including any term of imprisonment, fine, forfeiture, award of restitution, term of supervised release, authority of the Court to set conditions of release, and the manner in which the sentence was determined, *except to the extent the Court sentences your client above the statutory maximum or guidelines range determined by the Court, in which case your client would have the right to appeal the illegal sentence or above-guidelines sentence, but not to raise on appeal other issues regarding the sentencing.*

J.A. 108 (emphasis added). Adona and his counsel both signed the plea agreement.

The District Court determined that Adona's Guidelines range spanned from 7 years and 3 months in prison to 9 years in prison. The District Court then sentenced Adona to 9 years in prison, *within the Guidelines range*.

The majority opinion acknowledges that Adona's sentence fell within the Guidelines range. In light of the plea agreement, our task therefore should be easy: Dismiss Adona's appeal. As this Court has explained: "An appeal waiver serves the important function of resolving a criminal case swiftly and finally," and we "ordinarily dismiss an appeal falling within the scope of such a waiver." *United States v. Hunt*, 843 F.3d 1022, 1027 (D.C. Cir. 2016).

But the majority opinion overrides the appeal waiver and reaches the merits of Adona's appeal. The majority opinion says that the District Court mischaracterized the appeal waiver during the plea colloquy. For that reason, the majority opinion concludes that Adona's appeal waiver was not "knowing, intelligent, and voluntary." *In re Sealed Case*, 702 F.3d 59, 63 (D.C. Cir. 2012).

What was the supposed mischaracterization?

The majority opinion says that the District Court told Adona during the plea colloquy that Adona could appeal *any* sentence based on "reasonableness." But the District Court never said that. The District Court stated: "Now, *with regard to certain circumstances*, you may even have an opportunity, the right to appeal the sentence of this court on the grounds of reasonableness." Docket No. 258 at 10 (Filed 6/18/15) (emphasis added). The District Court's statement was accurate. The "certain circumstances" language indicated that there were some circumstances in which Adona would be able to appeal his sentence and some circumstances in which he would not be able to appeal his sentence.

What were those "certain circumstances," as relevant here? The written plea agreement plainly stated that Adona

could appeal an above-Guidelines sentence, but could not appeal a within-Guidelines or below-Guidelines sentence.

In short, there was no confusion or mischaracterization during the plea hearing. Indeed, after the District Court's colloquy with Adona, the District Court then asked the defense counsel to briefly describe the plea agreement's terms. The defense counsel stated correctly that Adona could appeal in a certain circumstance: *if the District Court imposed a sentence above the Guidelines*.

> And I've advised Mr. Adona of what Your Honor said to him in open court prior to this, that Your Honor – I don't know – I guess the best way to describe it would be that Your Honor had not made up – made a final decision that you would consider the advisory guidelines, but your inclination was that that – the court would probably depart upward and would state the reasons for that.

> I've explained to Mr. Adona, and I think Your Honor just went over briefly with him earlier, that under the plea agreement he retains the right to appeal that decision and – *if Your Honor does do that*. And as I said, I will be advocating that you not do that. But you've advised Mr. Adona of what your thoughts were on that issue.

*Id.* at 14 (emphasis added). The District Court then asked Adona, "Does that sound consistent with your understanding" of the plea agreement? *Id.* at 14-15. Adona answered, "Yes, sir." *Id.* at 15. A few minutes later, the District Court stated again, "Now, you've heard your attorney's description of the plea agreement. That's consistent with yours, right?" *Id.* at 19. Adona replied, "Yes." *Id.*

To reiterate, there was no confusion or mischaracterization at the plea hearing.

Nor was there any confusion about the appeal waiver during the subsequent proceedings in the case. For example, the presentence report – which was prepared after the plea hearing and before sentencing – succinctly explained the appeal waiver: "The defendant may appeal an illegal sentence or above-guideline sentence but may not raise other issues on appeal." J.A. 546. Adona never suggested to the District Court that the presentence report's description of the appeal waiver was incorrect.

On this record, I find it untenable to claim that Adona and his counsel were somehow operating under any confusion or misunderstanding about the scope of the appeal waiver.

Enforcing the waiver as written would hardly be unfair. Keep in mind that Adona received many benefits from his plea deal. Adona was involved in a significant PCP distribution operation in which the gang members terrorized Woodberry Village residents and took over apartments in the neighborhood in order to store and deal PCP. On top of that, Adona shot a man named Karl Carrington in the back during a marijuana transaction. Given his drug distribution activities and his violent criminal activity, Adona received a reasonably good plea deal here, at least as compared to many other similarly situated defendants. In return, Adona gave up (among other things) his right to appeal a within-Guidelines sentence, which is what he ultimately received.

We should enforce the appeal waiver and dismiss Adona's appeal.

5

II

The majority opinion also vacates Keith Matthews' sentence.  I also find that decision confounding.

A

Matthews was a member of the Woodberry Village drug distribution operation, and he ultimately was convicted of one offense: unlawful possession of a firearm by a felon.  The advisory Guidelines range for Matthews spanned from 6 years and 6 months in prison to 8 years and 1 month in prison.  The Government requested an above-Guidelines sentence of 10 years.  Matthews requested a within-Guidelines sentence of 6 years and 6 months.  The District Court varied upward from the Guidelines range, but not as much as the Government had requested.  The District Court sentenced Matthews to a slightly above-Guidelines sentence of 9 years in prison.

Seizing on the Guidelines range as if it were talismanic (which it is not post-*Booker*), the majority opinion concludes that the District Court committed procedural error by failing to adequately explain Matthews' above-Guidelines sentence.  I disagree.

We review sentences for procedural and substantive reasonableness.  For a sentence to be procedurally reasonable, a district court must, among other things, explain the sentence.  For a sentence to be substantively reasonable, a district court must impose a sentence that is not unreasonably short or long given all of the facts and circumstances of the offense and offender.

Under this Court's precedents on procedural reasonableness, a district court, in explaining an above-

Guidelines sentence, must also "state the specific reason why the defendant's conduct was more harmful or egregious than *the typical case* represented by" the Guidelines range. *United States v. Brown*, 808 F.3d 865, 866-67 (D.C. Cir. 2015) (emphasis added); *see also United States v. Akhigbe*, 642 F.3d 1078, 1086 (D.C. Cir. 2011). A district court must supply "individualized reasoning as to why" a sentence "above the Guidelines range was appropriate for this particular defendant." *Akhigbe*, 642 F.3d at 1086.

Even putting aside whether *Brown* and *Akhigbe* over-emphasized the Guidelines range in reviewing the procedural adequacy of a district court's sentencing explanation, the District Court here fully met its procedural obligations, including under those precedents. Matthews' crime of conviction was unlawful possession of a firearm as a felon. In sentencing Matthews slightly above the advisory Guidelines range, the District Court explained at length why it was sentencing Matthews to 9 years in prison.

The District Court stated:

You're engaged here in a drug operation, and you were involved with, of course, others, Mr. Brown in particular, involved in drug dealing. And you had a lot of weapons on you. You were involved with a lot of weapons. And there certainly was enough evidence for me to see that you were involved in some related acts of violence involved here. So the Court's mindful of all of that.

And the Court's mindful that it is very important to deter you from engaging in any conduct of this kind in the future.

. . . .

Of course, the Court also wants to deter others. There were young folks in that neighborhood, undoubtedly, who were aware of what you were doing and other folks with you, and maybe even looked to you or aspired to be like you. And we want to deter them from engaging in conduct of that kind, because that leads to more violence and more drug sales in the community.

And, of course, the Court needs to protect the community from that kind of conduct. We can't have people out selling drugs and running around with weapons, and, especially, weapons that can go off and – whether intentionally or accidentally, and hurt folks, whether they be little kids in an apartment or whether they be police officers trying to do their job across the street.

The Court also needs to promote respect for the law, respect not only for you to have for the law but for others to have for the law.

So for all of those reasons, a sentence at the high end of the guideline range, in my judgment, is not sufficient in this particular case for your sentence. Something more than that has to be done in order to deter you and others, protect the community, promote respect for the law, and, of course, give you a fair and adequate punishment under the circumstances.

So as a result of all of that, I've decided to vary upwards to 108 months. It's not the maximum but it's not the very top of the Guideline Range. And I'm doing it symbolically to make a point, that it's important that the people in the community, that you and others see that this kind of conduct has to stop, that you need to be deterred, they need

to be deterred, and that the community, of course, needs to respect the law, and you need to respect the law.

J.A. 487-89.

From the District Court's explanation and the record, we can identify at least five reasons why the District Court concluded that this was not an ordinary case and sentenced Matthews to 9 years in prison.

*First*, the District Court referenced the other "acts of violence" committed by Matthews. *Id.* at 488. Earlier in the hearing, the Government presented the evidence of those other acts of violence committed by Matthews: (i) firing "a firearm he had on his person multiple times in the area near the police to distract them"; (ii) firing a gun in Tiffany Williams' apartment while her eight-year-old son was present; and (iii) participating in the forcible takeover of Louis Clifton's home so that Matthews and the drug distribution operation could better conceal and organize their activities. Docket No. 402 at 9 (Filed 3/17/16). The District Court found that those acts of violence had been proved by a preponderance of the evidence. The District Court also concluded that those other acts were not the typical actions of an ordinary felon-in-possession defendant in this Guidelines range.

*Second*, the District Court concluded that Matthews posed a greater threat to public safety in his neighborhood than an ordinary felon in possession. Matthews and his colleagues used weapons to coerce neighbors into surrendering their homes.

*Third*, the District Court determined that Matthews' involvement in that neighborhood drug conspiracy made him an especially bad role model for youth in the community. This

was not a case where the drug dealers kept to themselves at home and bought and sold drugs at some other locale. This gang took over Woodberry Village apartments and sold drugs inside of Woodberry Village where children were present. Therefore, the District Court was understandably concerned about the impact of those illegal activities on the young people in the community.

*Fourth*, the District Court stated that Matthews was "involved with a lot of weapons," not just the one weapon that he was convicted of possessing. J.A. 488. The evidence presented at trial amply supported that conclusion. Specifically, Matthews complained in a text message that police had confiscated several of his guns, and pictures recovered from his cell phone showed Matthews with multiple guns – illustrating why his nickname in the drug distribution operation was "Bang." Docket No. 402 at 14.

*Fifth*, the District Court stressed the importance of promoting public respect for the rule of law, especially in a community besieged by drugs and violence. Matthews did far more than just possess a firearm, and the District Court thought it important that the sentence reflect that reality.

Those combined considerations led the District Court to conclude that "a sentence at the high end of the guideline range" was "not sufficient." J.A. 489.

This was not your typical felon-in-possession case within this Guidelines range. The District Court thoroughly explained that point when sentencing Matthews. In explaining the sentence, the District Court readily satisfied its procedural obligations under the sentencing precedents of the Supreme Court and this Court.

B

What about substantive reasonableness? On appeal, Matthews does not advance a substantive unreasonableness argument. That was a sound decision on his part. It is important to understand why that is so.

To begin with, we must keep in mind the critical distinction between procedural and substantive review of sentences. If a district court fails to explain why it imposed a particular sentence, that is *procedural* error. If a district court explains the sentence, but the district court's explanation (or to be precise, the facts and circumstances recounted in the district court's explanation) does not justify the length of the sentence, that is *substantive* error.

The appellate standard of review in sentencing cases is abuse of discretion. With respect to our substantive review, that abuse-of-discretion standard is especially deferential after *Booker* because there is no dispositive baseline or anchor to tell us what a proper sentence is for any given case. How short is too short? How long is too long? After *Booker*, the Guidelines are not the baseline or anchor because "the Guidelines are now advisory." *Gall v. United States*, 552 U.S. 38, 46 (2007). Therefore, the fact that the district court sentenced a defendant below, within, or above the Guidelines does not in and of itself suggest any unreasonableness in the sentence.

Take *Gall* as an example. The Supreme Court upheld a sentence of probation even though the Guidelines range was from 30 to 37 months of imprisonment. The Supreme Court explained that affording too much weight to the Guidelines range in the substantive review of sentences would create "an impermissible presumption of unreasonableness for sentences outside the Guidelines range" and "would not be consistent

with *Booker*." *Id.* at 47. The Supreme Court added that courts of appeals may not apply "a heightened standard of review to sentences outside the Guidelines range." *Id.* at 49.

In the wake of *Booker* and *Gall*, we have explained that the "substantive reasonableness inquiry that we must conduct on appeal boils down to the following question: In light of the facts and circumstances of the offense and offender, is the sentence so unreasonably high or unreasonably low as to constitute an abuse of discretion by the district court?" *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). Given that the substantive standard for sentencing in the *advisory* Guidelines regime is not tied to the Guidelines, and given that our appellate standard of review of a district court's sentence is the deferential abuse-of-discretion standard, it "will be the unusual case when an appeals court can plausibly say that a sentence is so unreasonably high or low as to constitute an abuse of discretion by the district court." *Id.*

Turning back to this case, it is not plausible to say that the 9-year sentence for Matthews is substantively unreasonable given the facts and circumstances of the offense and offender described above. That no doubt is why Matthews himself does not advance such an argument.

C

Having said all of that, I can identify three concerns one might have about the sentence in this case. But all three concerns are policy-based and, under the relevant Supreme Court precedents, do not qualify as legal grounds for vacating the sentence.

*First*, one may think that the top of the Guidelines range should represent the upper limit for a sentence, at least absent

extraordinary circumstances. But the problem with that position comes back to *Booker* and *Gall*. Under those cases, a district court does not need some special justification to impose an above-Guidelines sentence (or a below-Guidelines sentence, for that matter). Put another way, the special justifications needed for *departures* under the old *mandatory* Guidelines regime are not needed for *variances* under the current *advisory* Guidelines regime. The Supreme Court has emphasized that "the Guidelines are now *advisory*." *Gall*, 552 U.S. at 46 (emphasis added). Advisory means advisory.

*Second*, one may be concerned about the District Court's reliance on acquitted conduct when sentencing Matthews. *Cf. United States v. Bell*, 808 F.3d 926, 927-28 (D.C. Cir. 2015) (Kavanaugh, J., concurring in denial of rehearing en banc); *id.* at 928-32 (Millett, J., concurring in denial of rehearing en banc). Matthews was acquitted on all counts except for the one felon-in-possession charge, but he was then sentenced in essence as if he had been convicted on all of the counts. Defendants are understandably unhappy (to say the least) when that occurs. But that result is the not-uncommon byproduct of our current federal sentencing regime in which the jury assesses guilt under a reasonable doubt standard, while the district court then may find sentencing facts under a lesser preponderance of the evidence standard. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008).

In that bifurcated system, a district court may find that the defendant engaged in certain conduct even though the jury acquitted the defendant of engaging in that same conduct. If that system seems unsound – and there are good reasons to be concerned about the use of acquitted conduct at sentencing, both as a matter of appearance and as a matter of fairness – Congress and the Supreme Court may fix it, as may individual district judges in individual cases. *See id.* at 924; *see also Bell*,

808 F.3d at 927-28 (Kavanaugh, J., concurring in denial of rehearing en banc); *United States v. Henry*, 472 F.3d 910, 918-22 (D.C. Cir. 2007) (Kavanaugh, J., concurring). But under current law, the district court may base the sentence in part on facts found at the sentencing hearing by a preponderance of the evidence.

*Third*, one may think that Matthews' 9-year sentence is simply too long given the facts in this case as found and recounted by the District Court. But the problem with reaching such a conclusion is our deferential substantive standard of review: abuse of discretion. In light of that deference, it is not remotely plausible to say that the 9-year sentence in this case is too long. *See Gall*, 552 U.S. at 47. Indeed, even Matthews does not argue as much.

In short, those three policy-based concerns supply no legal justification for vacating the sentence.

## D

Because the District Court fully explained the sentence, thus satisfying its procedural obligations, and because the 9-year sentence was substantively reasonable, Matthews' case should be an easy affirmance.

Why, then, does the majority opinion vacate Matthews' sentence?

The majority opinion says that the District Court committed procedural error by not adequately explaining Matthews' sentence. That conclusion is not tenable, in my view. As described above, the District Court fully explained its decision and met its procedural obligations.

The majority opinion apparently is not persuaded by the District Court's explanation. But the persuasiveness of the District Court's explanation is not a *procedural* issue. It is a substantive issue – and therefore is not a proper basis for vacating the sentence in this case, where Matthews did not (and could not plausibly) raise a substantive unreasonableness argument.

In any event, because the majority opinion nominally classifies this case as one of procedural error, and does not claim that the above-Guidelines 9-year sentence was substantively unreasonable under the facts and circumstances here, the District Court on remand may simply re-impose the same 9-year sentence. All the District Court needs to say is that it believes, as a policy matter, that the Guidelines range is too low for Matthews' offense. *See Kimbrough v. United States*, 552 U.S. 85, 101-02, 109 (2007). Or in the alternative, the District Court can further explain (really, re-explain) why the facts and circumstances of Matthews' offense justify a 9-year sentence. Unless and until this Court says that a 9-year sentence for Matthews is substantively unreasonable, the District Court need not change its prior sentence.

\* \* \*

We should dismiss Adona's appeal and affirm Matthews' sentence. I respectfully dissent on those two issues.