# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 19, 2020        Decided June 11, 2021

No. 19-3015

UNITED STATES OF AMERICA,
APPELLEE

v.

KENIEL AEON THOMAS, ALSO KNOWN AS DAVID MORGAN,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cr-00310-1)

*Rosanna M. Taormina*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A.J. Kramer*, Federal Public Defender. *Tony Axam Jr.*, Assistant Federal Public Defender, entered an appearance.

*Nicholas P. Coleman*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Elizabeth Trosman* and *Kathryn L. Rakoczy*, Assistant U.S. Attorneys.

2

Before: HENDERSON and GARLAND,* *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

Concurring opinion filed by *Circuit Judge* HENDERSON

GINSBURG, *Senior Circuit Judge*:   Keniel Thomas, a resident of Jamaica, pleaded guilty to one count of interstate communication with intent to extort, in violation of 18 U.S.C. § 875(b), after botching a lottery scam.[1]  In the plea agreement, Thomas waived most of his rights to appeal.  He retained only the rights to claim he received ineffective assistance of counsel and to appeal any upward departure from the sentencing guidelines range calculated by the district court.  At sentencing, the district court did depart upward and sentenced Thomas to nearly six years' imprisonment.

Thomas mounts several challenges to his sentence.  First, he argues the Government plainly breached the plea agreement at sentencing.  We disagree.  Second, he claims his waiver of rights to appeal is unenforceable and then raises four issues within the scope of the waiver.  We assume without deciding the waiver was ineffective and reject these challenges on their merits.  Third, Thomas argues the district court abused its

---

* Then-Judge Garland was a member of the panel at the time this case was submitted but did not participate in the final disposition of the case.

[1] In a lottery scam, "scammers lead victims to believe they have won a drawing or lottery, but the cash or prizes will not be released without upfront payment of fees or taxes.  Scammers frequently target the elderly."  U.S. Embassy in Jamaica, *Lottery Scams*, https://jm.usembassy.gov/u-s-citizen-services/victims-of-crime/scams (last visited May 14, 2021).

discretion by departing upward from the guidelines range. We find no abuse of discretion. Finally, Thomas claims his attorney made mistakes at sentencing and during the plea bargaining process that deprived him of his right to the effective assistance of counsel under the Sixth Amendment to the Constitution of the United States. We remand some of Thomas's ineffective assistance claims to the district court for further fact-finding and deny the rest.

## I. Background

We first discuss the plea agreement and the stipulated facts. After that, we summarize additional evidence the Government presented with its sentencing memorandum and the proceedings at the sentencing hearing.

## A. The plea agreement

As part of his plea agreement, Thomas stipulated to a statement of offense that established the following facts.

\*\*\*

In June 2014, Thomas made a call to William Webster, whom Thomas knew to be an elderly former judge. Thomas identified himself as the head of the Mega Millions lottery and told the Judge he was the winner of an eight-figure prize. To collect it, Webster needed only to make an advance payment of $50,000 to cover taxes. If Thomas thought Judge Webster would be easily fooled due to his advanced age, then he was seriously mistaken. Perhaps unbeknownst to Thomas, he was trying to scam a man who once headed the Federal Bureau of Investigation. After hanging up with Thomas, Judge Webster phoned the Bureau.

The next day, Judge Webster called Thomas back, this time recording their conversation for the FBI. Thomas restated many of his falsehoods from the day before, except this time the fake prize amount quadrupled and the fake tax payment dropped to $20,000. Judge Webster humored Thomas, but did not agree to anything. Undeterred, Thomas made several more calls to Judge Webster over the following month.

Eventually Thomas became frustrated and resorted to threats instead of false promises. On July 17, he called Judge Webster's home phone and reached his wife, Lynda Webster. Thomas demanded the Websters pay him $6,000. If they did not pay him, then he would have both of them killed by a sniper and set fire to their home. To make his threats more plausible, Thomas recounted personal identifying information about the Judge, including his previous employment. He further told Mrs. Webster he had been surveilling her home. He correctly described the house and correctly stated no one had been home the previous evening.

Thomas made more threats in additional conversations with Mrs. Webster over the following days. On July 21, in an especially shocking outburst, Thomas told her, "it is so easy killing you, you just a take a shot and put it in your sniper, aim, and the back of the head … all you see is blood and marrow flying out." He urged the Websters to pay him $6,000 in order to avoid this fate.

Having no success in securing the $6,000, Thomas apparently gave up on the Websters. Three years later, federal agents arrested him entering the United States at a New York airport.

\*\*\*

In a deal with the Department of Justice, Thomas admitted to the facts above and pleaded guilty to one count of interstate communication with intent to extort, 18 U.S.C. § 875(b). In exchange, the Department agreed not to bring any additional charges.

In the plea agreement, the parties estimated his offense level under the Sentencing Guidelines at 20, comprising a base offense level of 18, U.S.S.G. § 2B3.2; a two-level increase because his extortionate conduct included death threats, U.S.S.G. § 2B3.2(b)(1); a one-level increase because he tried to extort more than $20,000, U.S.S.G. § 2B3.2(b)(2); a two-level increase for conduct aimed a vulnerable victim, U.S.S.G. § 3A1.1; and a three-level decrease for acceptance of responsibility, U.S.S.G. § 3E1.1. Thomas had no prior criminal convictions, so this offense level resulted in an estimated guidelines range of 33 to 41 months in prison. *See* U.S.S.G. § 5A. In the agreement, Thomas waived his right to appeal "except to the extent" the court sentenced him "above the statutory maximum or the guidelines range determined by the Court" but he reserved the right to claim he received ineffective assistance of counsel.

## B. Sentencing

After Thomas pleaded guilty, the Government submitted a sentencing memorandum accompanied by 38 exhibits, which gave a fuller picture of the FBI's investigation than had the statement of offense. The evidence suggested a long-running and intricate conspiracy. According to the sentencing memorandum, it was not Thomas but his associate "Stone" who first contacted Judge Webster. In March 2014, Stone called Judge Webster, informed him he had won the lottery, and instructed him to send $1,000 to a California man

identified in the record as "P.W." Judge Webster immediately contacted the FBI.

At the Bureau's request, Judge Webster stayed in phone and email contact with Stone, and his associates "Dudley," "Reinhardt," "Davis," and "Winslow" over the next few months. The FBI's investigation revealed P.W. was a victim who had been tricked into serving as a "money mule" for Thomas and his associates. The FBI identified dozens of other victims in the United States, many of them elderly. Agents were able to trace over $300,000 of payments flowing to Thomas and his associates, but estimated the total loss was much higher. For instance, one eighty-two year old victim claimed to have lost over $600,000, although the FBI was able to trace less than one-third of his loss.

Thomas did not dispute any of these facts in his sentencing memorandum. At the sentencing hearing, however, Thomas's attorney objected to a paragraph in the presentence investigation report (PSR) prepared by the Probation Office that mentioned there were victims besides the Websters. The district judge overruled the objection after an FBI agent testified to the findings of the investigation. The agent's testimony corroborated the evidence in the Government's sentencing memorandum (and thus the disputed paragraph of the PSR). The court accepted the unrebutted evidence presented in the sentencing exhibits and the agent's testimony as its findings of fact.

The district court went on to impose a sentence longer than the Government had requested. The court applied an offense-level enhancement not mentioned in the plea agreement because it found Thomas "demonstrated the ability to carry out" his threats. *See* U.S.S.G. § 2B3.2(b)(3)(B)(ii). This brought the sentencing guidelines range up to 46-57 months.

The court then applied two upward departures suggested in the Extortion Guideline: one for extortion that "involved organized criminal activity" and one for "a threat to a family member of the victim." U.S.S.G. § 2B3.2 cmt. n.8. As a result, the court sentenced Thomas to 71 months in prison, 30 months more than the maximum estimated in the agreement.

## II. Analysis

We begin our analysis with the alleged breach of the plea agreement. Second, we analyze the waiver of appellate rights in the plea agreement and the issues that it arguably bars. Third, we review the district court's decision to depart from the guidelines range. In the final section, we address Thomas's ineffective assistance of counsel claims.

### A. Breach of plea agreement

In the plea agreement, the Government promised it would not "seek any offense-level calculation different" from the calculation in the agreement. ECF No. 20, at 4. On appeal, Thomas argues the Government breached the plea agreement by seeking a sentencing enhancement for a demonstrated ability to carry out an extortionate threat.

Because Thomas did not object at sentencing, our review is for plain error. *Puckett v. United States*, 556 U.S. 129, 133-34 (2009). We may reverse only if any breach (1) was "clear or obvious, rather than subject to reasonable dispute," (2) prejudiced the defendant, and (3) resulted in a miscarriage of justice. *Id.* at 135. We find no breach here regardless of the standard of review.

The Government did not mention the demonstrated-ability enhancement in its sentencing memorandum. At the

sentencing hearing, the judge on her own initiative asked the prosecutor about it. The prosecutor, noting he was in an "unfortunate and somewhat difficult position," stated it "was our interpretation and our understanding of the facts that we have before us that this offense did not involve the ability of the defendant to carry out this threat given what we knew at the time." The judge pushed back, asking "in this case don't we have the defendant talking to Lynda Webster and … trying to demonstrate with pretty concrete evidence his ability to carry out his threat?" But the prosecutor stood his ground: "Our position is that he was not able to otherwise demonstrate the ability to carry that out through those threats." The judge asked whether the Government's position was contrary to her reading of cases from the Third and Seventh Circuits, which held it is "irrelevant" whether the defendant "actually had the ability to carry it out." The prosecutor said, no, "we're basing it in large part on the facts … in our case." The court asked whether actual ability was irrelevant "as a legal matter" – trying to understand whether the Government took that position "because he was in Jamaica, we didn't think he had the ability to carry it out; you don't think it applies." The prosecutor said no, "as a legal matter, we are not saying that." After taking a moment to confer with a colleague, he concluded: "We are not arguing that legally that it doesn't apply. We are not asking that it apply in this case."

There was no breach here. The Government promised to argue for the stipulated guidelines range (which it did), but it never promised to convince the judge this range was correctly calculated. *See* Plea Agreement, ECF 20, at 5 ("[Thomas] acknowledges that the Court is not obligated to follow any recommendation of the Government at the time of sentencing").

Thomas interprets the double negative in the prosecutor's penultimate sentence, "We are not arguing that legally that it doesn't apply," as "effectively agree[ing]" the court should apply the demonstrated-ability enhancement, and argues this constitutes a breach. We read the transcript differently. The prosecutor resisted the court's characterization of the Government's position, namely, that the enhancement is appropriate only where the defendant had the power to carry out his threats, so Thomas's being in Jamaica (and presumably unable to harm the Websters) was dispositive. Rather, the prosecutor seemed to agree with the court's view of the law but maintain that the totality of the facts did not support the enhancement.

This is how the Government reads the transcript as well. As it points out, nothing in the plea agreement required the prosecutor to argue for a bright-line rule that a defendant's inability to make good on his threats is dispositive; to the contrary, he had an ethical duty to answer the court's questions honestly.

Even if we understood the double negative as a feeble admission the enhancement might apply, we would still hold the prosecution did not breach the agreement. The fact is that, as agreed, the Government did not at any point "seek" the enhancement. The district court raised it without any prompting – explicit or implicit – from the Government and applied it over the Government's repeated objection.

## B. Waiver of rights to appeal

In exchange for "concessions made by the Government" in the plea agreement, Thomas waived his right to "appeal the sentence in this case … and the manner in which the sentence was determined, except to the extent the Court sentence[d]

[him] above the statutory maximum or guidelines range determined by the court." A waiver of the right to appeal is "generally enforceable," so long as it is "knowing, intelligent, and voluntary." *United States v. Guillen*, 561 F.3d 527, 528-29 (D.C. Cir. 2009) (analyzing a similar waiver). Thomas raises several issues that fall within the scope of the waiver.[2] He attempts to bypass the waiver in two ways.

First, Thomas argues that because the district court departed upward from the guidelines range he is free to challenge his sentence upon any ground whatsoever. This is belied by the text of the agreement, which barred an appeal "except to the extent" the court sentenced him above the guidelines range. *See United States v. Hunt*, 843 F.3d 1022, 1027 (D.C. Cir. 2016) ("Like statutory construction, interpretation of a plea agreement begins with plain language" (citations omitted)). The extent to which the court sentenced Thomas above the guidelines range is the portion of the sentence attributable to the upward departure. *Cf. Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998) (interpreting "to the extent obtained by" fraud to mean "the share … that is obtained by fraud"). To challenge the underlying guidelines calculation or other aspects of the sentencing would be to go beyond the extent of the upward departure.

Second, Thomas argues the district court's explanation of the waiver of rights to appeal at his plea hearing effectively

_____

[2] Specifically, he asserts the district court abused its discretion and/or clearly erred by (1) finding an incorrect "amount demanded" under the Extortion Guideline, (2) applying the "vulnerable victim" enhancement under U.S.S.G. § 3A1.1(b)(1), (3) applying the demonstrated-ability enhancement, (4) describing the lottery scam as an "extortion scheme" rather than a scheme to defraud, and (5) failing to provide a reasonable basis for rejecting a downward variance based upon his status as a deportable alien.

altered the terms of the waiver to allow appeal on any issue in the event of an upward departure. This contention cannot be rejected as easily as the previous one.

Before a district court may accept a guilty plea, Rule 11(b) of the Federal Rules of Criminal Procedure requires the judge to "inform the defendant of, and determine that the defendant understands," certain important terms and consequences of the plea agreement. The purpose of the Rule, generally, is "to ensure that [the defendant] understands … his rights as a criminal defendant" before entering a guilty plea. *United States v. Vonn*, 535 U.S. 55, 62 (2002). A waiver of rights to appeal is a consequential term in a plea agreement, so the Rule specifically requires the judge to explain its terms to the defendant and to confirm the waiver is entered knowingly, intelligently, and voluntarily. Fed. R. Crim. P. 11(b)(1)(N); *see also United States v. Lee*, 888 F.3d 503, 506 (D.C. Cir. 2018).

Due to the vital constitutional interests Rule 11 safeguards, we have insisted that district courts "scrupulously adhere" to its requirements. *United States v. Brown*, 892 F.3d 385, 395 (D.C. Cir. 2018) (quoting *United States v. Shemirani*, 802 F.3d 1, 3 (D.C. Cir. 2015)). If "the district court mischaracterize[s] the meaning of the waiver in a fundamental way" at the plea hearing, then "the district court's oral pronouncement controls, and the appeal is not barred." *Brown*, 892 F.3d at 395 (quoting *United States v. Godoy*, 706 F.3d 493, 495-96 (D.C. Cir. 2013), cleaned up); *see also, e.g.*, *Hunt*, 843 F.3d at 1028-29; *United States v. Kaufman*, 791 F.3d 86, 88 (D.C. Cir. 2016). A representative case is *Brown*, where the district court summarized a waiver provision nearly identical to the one here as follows: "[W]ith regard to certain circumstances, you may even have … the right to appeal the sentence … on the grounds of reasonableness." 892 F.3d at 395. On appeal, we did not "pause to parse the precise legal meaning of 'reasonableness.'"

*Id.* at 396. Instead, we refused to enforce the waiver based upon "the common meaning" of the district court's pronouncement. *Id.*

Scrupulous implementation of Rule 11 does not require "a litany or other ritual which can be carried out only by word-for-word adherence to a set 'script.'" Fed. R. Crim. P. 11(h), Advisory Committee's Notes to 1983 Amendment. To the contrary, a lifeless recitation of the plea agreement is disfavored; "a more meaningful explanation" in the judge's own words is preferred. *Id.* (quoting *United States v. Saft*, 558 F.2d 1073, 1079 (2d Cir. 1977)). It is, admittedly, a delicate balance the district court must strike: Provide enough explanation to dispel any misunderstanding without simply reading the agreement aloud, but in doing so, take care not to create a new or different misconception that effectively amends the written agreement.

During the Rule 11 colloquy in this case, the court explained the waiver as follows:

> THE COURT: Do you understand that by pleading guilty you are giving up all of your rights … to appeal your sentence, unless you are sentenced to a period of imprisonment longer than the statutory maximum or the court departs upward from the applicable recommended sentencing guideline range, which is all set out in your plea letter at page 7, paragraph 10? Do you understand that?
>
> THE DEFENDANT: Yes, Your Honor.

The key difference between the written agreement and the court's explanation is that the court paraphrased "except to the extent" as "unless." Thomas says there is an "arguable

divergence" between the court's explanation and the agreement as written, and so the court's explanation should control.

We agree the two arguably diverge insofar as "unless" is less precise and broader than "except to the extent." The written terms of the agreement, as explained above, were specific.[3] The district court's paraphrase, taken literally, tells the defendant he is not giving up all his rights to appeal if the district court departs upward, but does not specify which rights would be retained if that happened. The natural understanding, however, is that the right retained is the right mentioned – that is, the right to appeal the upward departure. As the Government put the point at oral argument, "There's no reason why the decision to … go above the guidelines range should then make everything else appealable. That isn't … a reasonable interpretation of the provision."

In light of these conflicting considerations, I think that whether the district court fundamentally mischaracterized the waiver provision is a close question. *But see* Henderson, J., Concurring Op., *post*. We need not answer it, however, because Thomas's challenges to the arguably waived issues lack merit. *See United States v. Fry*, 851 F.3d 1329, 1331-32 (D.C. Cir. 2017) ("Because the waiver question does not go to our court's jurisdiction, we can forgo deciding it if we reject [defendant's] sentencing challenges on the merits").

---

[3] This is not to say the written waiver was beyond improvement. The written waiver in *Brown*, for example, was even more specific; it stated the defendant could appeal an above-guidelines sentence but could not "raise on appeal other issues regarding the sentencing." 892 F.3d at 395.

### 1. Stipulated guidelines enhancements

Thomas faults the district court for applying two offense level enhancements recommended in the plea agreement, to wit, the vulnerable victim enhancement, U.S.S.G. § 3A1.1(b)(1), and the enhancement for extortion where the amount demanded exceeded $20,000, U.S.S.G. § 2B3.2(b)(2). The Government argues he waived his right to challenge this aspect of the guidelines calculation, quite apart from the explicit waiver of his right to appeal, by negotiating and accepting a plea deal that stipulated the enhancements apply. Therefore, the Government argues, we should not review this aspect of the guidelines calculation even for plain error.

The Government is correct. While we review for plain error when a defendant has forfeited an issue through a failure to object, we will not review at all when a defendant acts intentionally to waive an issue. *United States v. Laslie*, 716 F.3d 612, 614 (D.C. Cir. 2013) (citing *United States v. Olano*, 507 U.S. 725, 733 (1993) for the distinction between forfeiture and waiver). For instance, when a defendant makes a "tactical decision" to request a certain jury instruction, he is barred from complaining about the instruction on appeal; any error was "invited" by the defendant. *United States v. Harrison*, 103 F.3d 986, 992 (D.C. Cir. 1997); *Brown*, 892 F.3d at 392-93; *cf. United States v. Long*, ___ F.3d ___, No. 20-3064, 2021 WL 1972245, at *6-7 (D.C. Cir. May 18, 2021) (no waiver where counsel made a "mistake" rather than employing a "strategy or tactic"). This rule discourages sandbagging, that is, purposefully inducing the district court to commit an error that can form the basis for an appeal in the event of an unfavorable result at trial or sentencing. *Harrison*, 103 F.3d at 992.

Negotiating a plea agreement, like requesting a jury instruction, requires counsel to think strategically. *See Guillen*,

561 F.3d at 530. In both situations counsel must evaluate the various options and advise the defendant of their respective risks and benefits. And in both situations there is a potential for sandbagging. Therefore, we have held a defendant waives his right to contest a guidelines adjustment to which he has stipulated in his plea agreement: "This court does not allow parties to reopen issues waived by stipulation at trial." *Laslie,* 716 F.3d at 615.

We have no doubt that Thomas intentionally waived the issues he now seeks to raise; there was no mere forfeiture or mistake. Thomas's plea agreement provided for an offense level increase because the "amount demanded" exceeded $20,000, U.S.S.G. § 2B3.2(b)(2), and another increase because "a victim of the offense was a vulnerable victim," U.S.S.G. § 3A1.1(b)(1). At the Rule 11 hearing, the judge asked Thomas whether he understood the estimate in the plea agreement that his offense level would be increased "by one offense level because you demanded over $20,000[] and by two offense levels because the two victims were vulnerable victims." Thomas confirmed that he understood. When the Probation Office produced the PSR, it confirmed the parties' guidelines calculation. In his sentencing memorandum Thomas adverted to this portion of the PSR but did not object to it. Finally, when at the sentencing hearing the court accepted the recommendation to apply these two enhancements, Thomas, through counsel, again stated he did not object.

Despite all this, Thomas argues there was no waiver because the district court stated it had an "independent obligation" to calculate the guidelines range rather than relying solely upon the calculation estimated by the parties. Therefore, he says, his stipulation did not induce the district court's decision and we should review for plain error after all. The point is not well taken; the district court has an "independent

obligation" to calculate the guidelines range in every case. *Freeman v. United States*, 564 U.S. 522, 529 (2011). If that undercut the defendant's waiver here, it would do so everywhere. Therefore, we hold Thomas waived his challenge to the two disputed enhancements.

### 2. Demonstrated ability

The Extortion by … Threat of Injury Guideline provides for an enhancement of three offense levels if "the offense involved preparation to carry out" or the defendant "otherwise demonstrated the ability to carry out" a threat of death, serious injury, or kidnapping. U.S.S.G. § 2B3.2(b)(3)(B). Application Note 6 explains the enhancement would be appropriate if, for example, "an extortionate demand containing … a threat to kidnap a person [were] accompanied by information showing study of that person's routine." The district court applied this enhancement over the objection of both Thomas and the Government.

The district court did not abuse its discretion by applying the enhancement on these facts, which closely track the example from Note 6. Indeed, the Seventh Circuit upheld application of the enhancement to similar facts in *United States v. Hacha*, 727 F.3d 815 (2013). There the extortionist, who threatened to harm the victim's parents, demonstrated his ability to carry out the threat by telling the victim (1) his parents' names, (2) their address in Mexico City, and (3) the color of their house. *Id.* at 817. Here, Thomas showed the Websters he knew their names, home address, and house color, and went farther still. To corroborate his claim the house was under surveillance, he correctly told Mrs. Webster she was not home the night before.

Thomas argues he did not demonstrate an ability to carry out his threats because he did not actually have the ability to carry them out; he was, after all, in Jamaica at the time. But the defendant being out of the country is not dispositive because having and demonstrating an ability are not the same thing. *See United State v. White*, 654 F. App'x 956, 969-70 (11th Cir. 2016) (holding the defendant, who was in Mexico at the time, demonstrated the ability to carry out threats against Florida officials when he revealed he knew their names, addresses, and grandchildren's names).

### 3. "Extortion scheme" or "scheme to defraud"

Thomas claims the court erred by referring several times at sentencing to an "extortion scheme." According to Thomas, the scheme is more accurately characterized as a "scheme to defraud" because most calls to victims did not include extortionate threats. Thomas never objected to the court's characterization at sentencing, so our review is for plain error. Even granting that the court's use of the phrase was inaccurate, the challenge fails because Thomas does not explain how it affected his substantial rights.

### 4. *Smith* variance

As a deportable alien, Thomas is not eligible for "the benefits of 18 U.S.C. § 3624(c), which directs the Bureau of Prisons, to the extent practicable, to assure that prisoners spend part of … their sentences … under conditions — possibly including home confinement — that will 'afford the prisoner a reasonable opportunity to adjust to and prepare for his re-entry into the community.'" *United States v. Smith*, 27 F.3d 649, 651 (D.C. Cir. 1994). In his PSR, the Probation Office raised the possibility of a downward departure to compensate for the increased severity of Thomas's punishment due to his

ineligibility for this and other Bureau of Prisons programs (a *Smith* departure). *See id.* at 655. At the sentencing hearing, defense counsel declined to argue in support of this departure because he was bound by the plea agreement not to argue for any departures, but he said he intended to argue later for a downward variance on those same grounds (a *Smith* variance). At the appropriate time, however, defense counsel did not raise *Smith* or otherwise make the case for a variance. Later in the hearing, the district judge independently considered granting a variance or departure under *Smith*. She concluded neither was warranted: "[G]iven the fact that you committed your current offense while you were in Jamaica, it appears to me that being abroad doesn't impede your criminal conduct here; I'd only delay bringing you to justice here."

Thomas argues the district court did not articulate a reasoned basis for declining to impose a departure or a variance under *Smith*. *See Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority"). Because Thomas did not object to the district court's statement of reasons at sentencing, our review would be for plain error if we were to reach this argument. *United States v. Locke*, 664 F.3d 353, 357 (D.C. Cir. 2011). For reasons stated later in this opinion, however, we hold Thomas's attorney was ineffective as a matter of law in failing to argue for and present evidence supporting a *Smith* variance and in failing to object to the district court's stated reason for denying one. This ineffective assistance of counsel claim will be remanded to the district court so it can determine whether counsel's errors were prejudicial. On remand, the district court will need to consider arguments for the variance and will have to provide a reasoned basis for accepting or rejecting them. Consequently, we need not decide whether the

district court plainly erred. *Cf. United States v. Soto*, 132 F.3d 56, 59 (D.C. Cir. 1997) ("In view of our conclusion that counsel was ineffective, we need not reach [the defendant's] alternative argument that the district court committed plain error").

## C. Upward departures

In Application Note 8 to the Extortion Guideline, the Sentencing Commission advises that "[i]f the offense involved organized criminal activity, or a threat to a family member of the victim, an upward departure may be warranted." U.S.S.G. § 2B3.2 cmt. n.8. The district court found Thomas's offense involved both organized criminal activity and a threat to a family member and departed upward upon both grounds.

Thomas attacks the rationales for both departures. He first argues the district court erred by treating Application Note 8 as a "directive" rather than a suggestion. As the transcript shows, however, the district court well understood the departures to be permissive: "So I am going to address the two departures … that are expressly recommended for consideration where the facts warrant."

The district court was clearly correct the conduct involved threats to a family member. Thomas told Mrs. Webster several times he would murder her husband if he was not paid. These threats were recorded and Thomas admits to making them.

Thomas insists "a threat to a family member of the victim" means a threat communicated to that family member. Under this interpretation, the departure would be justified only in rare circumstances, if ever, because the person with whom the extortionist speaks will usually be "the victim" of the extortion, not a relative of the victim. Thomas's reading of the Guideline

is strained and unnatural: If a victim said an extortionist called and threatened to kill his toddler, one would not understand the victim to have put the child on the phone. The better interpretation is that the departure is permitted where the defendant threatens the victim with harm to a member of the victim's family.

Regarding the organized crime departure, Thomas asks us to view the phone calls to Mrs. Webster in isolation. Because none of Thomas's associates joined him on the calls, he reasons the offense did not involve organized crime. The district court was not required to take such a narrow view. The extortionate threats were made as the culmination of a plot that involved Thomas and other members of his criminal organization. Thomas's associates also contacted the Websters, and Thomas directed the Websters to send money to his mules as part of a complex, orchestrated scheme. Even looking only to the recording of the July 21 phone call, there is evidence of organized crime. Thomas spoke in the first-person plural (*e.g.*, "We know where your home is. We have your address. We have everything about you. So easy that we go set your home ablaze.") and directed Mrs. Webster to send money to his "good friend" in New York.

Finally, Thomas attacks the extent of the organized-crime departure. He argues the district court abused its discretion by adding one offense level to account for the scope of the organization's crimes because, in doing so, the court analogized to the loss table in the Robbery Guideline, U.S.S.G. § 2B3.1(b)(7). He says the court should have looked instead to the Fraud Guideline, U.S.S.G. § 2B1.1. But the loss table in the Fraud Guideline escalates much more quickly: it prescribes an increase of eight levels if the loss exceeded $95,000 and an increase of 12 levels if the loss exceeded $250,000. Therefore,

Thomas benefitted from the analogy and has neither standing nor reason to complain about it.

**D. Ineffective assistance**

Thomas claims his defense attorney made several errors during plea negotiations and at sentencing that deprived him of his Sixth Amendment right to counsel. To prevail on these claims, Thomas must show (1) his attorney made errors so serious he was not functioning as "counsel," and (2) the errors were prejudicial. *United States v. Rashad*, 331 F.3d 908, 909 (D.C. Cir. 2003). When a defendant asserts ineffective assistance claims for the first time on direct appeal, we "remand the claim for an evidentiary hearing unless the trial record alone conclusively shows that the defendant either is or is not entitled to relief." *Id.* at 909-10 (cleaned up).

The Government agrees that several of the ineffective assistance claims should be remanded to the district court for fact-finding.[4] It argues, however, that four of the claims should be dismissed in this appeal, *viz*., that defense counsel: (1) failed to argue for or present facts supporting a *Smith* variance, and failed to object to the district court's reason for rejecting one;[5] (2) "affirmatively agreed" to "incorrect" offense-level enhancements; (3) failed to argue persuasively against the "demonstrated ability" enhancement; (4) did not object to the

---

[4] The Government does not object to remanding the ineffective assistance claims based upon defense counsel's failure: (1) to present "documentation" supporting a *Smith* variance, (2) raise mitigating facts contained in the Government's sentencing exhibits, (3) review the exhibits with Thomas, and (4) submit character letters Thomas's family and friends had written. We remand these claims to the district court for further proceedings.

[5] The Government agrees this claim must be remanded in part. *See supra*, n.4. As discussed below, we remand it in full.

Government's breach of the plea agreement; and (5) presented no argument against the "organized criminal activity" and "threat to family member" departures. We will address these individually.

**1. *Smith* variance**

The record conclusively shows Thomas's counsel made unprofessional errors in failing to seek a downward variance due to Thomas's status as a deportable alien. Even before the Supreme Court's decision in *United States v. Booker* allowed judges to vary from the Sentencing Guidelines, 543 U.S. 220 (2005), this Circuit recognized "a downward departure may be appropriate where the defendant's status as a deportable alien is likely to cause a fortuitous increase in the severity of his sentence." *Smith*, 27 F.3d at 655. In Thomas's PSR, the Probation Office noted his "status as a deportable alien may warrant a downward departure."

Defense counsel did not zealously or diligently pursue a *Smith* variance.[6] In Thomas's sentencing memorandum, counsel did not even echo the Probation Office's call for a sentencing reduction or otherwise bring up *Smith*. Defense counsel later submitted a supplemental sentencing memorandum requesting a downward variance based upon Thomas's susceptibility to "physical beating" in jail, which Thomas attributed to his nationality. The supplemental memorandum again failed to mention *Smith* or the Probation Office's suggestion. Then, at sentencing, the court asked the

---

[6] The plea agreement prohibited defense counsel from seeking a downward departure, so counsel would have needed to request a *Smith* variance rather than a *Smith* departure. This difference is immaterial here because, as defense counsel recognized, the considerations animating *Smith* apply equally to a variance and a departure.

parties to comment on the possibility of a *Smith* departure. Defense counsel, being unable to seek a downward departure, could not opine but stated he would raise *Smith* again when the court considered variances. When the time came, however, defense counsel did not raise *Smith*, choosing instead to rest on the arguments in his original sentencing memorandum.[7]

The court returned to the issue on its own later in the hearing, stating:

> I have also considered whether or not there should be a downward variance or departure due to your deportation after this sentence and the fact that there might be an increase in the severity of your sentence because of your inability to serve the last part of your sentence in a community-based confinement or in some kind of reentry program. But given the fact that you committed your current offense while you were in Jamaica, it appears to me that being abroad doesn't impede your criminal conduct here; I'd only delay bringing you to justice here.

Defense counsel did not object to this explanation.

It is clear from the record that defense counsel acted unprofessionally in failing to seek a *Smith* variance after the issue was flagged in the PSR. *Cf. Soto*, 132 F.3d at 58-59 (holding counsel was clearly ineffective where he failed to raise a "potentially helpful" provision of the Guidelines). The

---

[7] Specifically, when the time came to discuss variances, the judge listed the five variances defense counsel requested in the sentencing memorandum (which did not include a variance under *Smith*), and asked him "Is that basically it?" Counsel responded, "Yes, Your Honor, that is effectively it." The judge asked whether counsel had anything to add to his variance arguments, but counsel stated: "There is nothing more to amplify."

record shows this was not a strategic choice; counsel stated his intent to raise the issue, but then failed to do so. This was an error serious enough, if it affected the outcome, to deprive Thomas of his constitutional right to counsel.

What is less clear is whether Thomas suffered any prejudice. Despite counsel's failure to request the variance, the district court considered whether to grant it. The district court may or may not have been persuaded had counsel offered a cogent argument. We remand this claim to the district court to allow Thomas to present arguments and evidence supporting a *Smith* variance.

### 2. Stipulated guidelines enhancements

In his plea agreement, Thomas stipulated to two enhancements of his offense level that he now argues were inappropriate: (1) a one-level increase because "the amount demanded … exceeded $20,000," U.S.S.G. § 2B3.2(b)(2), and (2) a two-level increase because Thomas "knew or should have known that a victim of the offense was a vulnerable victim," U.S.S.G. § 3A1.1(b)(1).

To determine whether these enhancements apply, a court may consider only the "relevant conduct" as defined in the Guidelines, which includes acts and omissions "that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a). Whether the two enhancements were appropriate would depend in large part upon whether the relevant conduct included the calls to Mrs. Webster only or included also the calls to Judge Webster: Thomas demanded $50,000 during his attempt to defraud Judge Webster, but demanded only $6,000 from Mrs. Webster; Judge Webster was arguably a vulnerable

victim because he was over 90 years old at the time of the offense, but there is no suggestion Mrs. Webster was unusually vulnerable. The Government asserted in the district court that the relevant conduct included the calls to both Websters, but it does not defend that position on appeal; nor does it otherwise argue the enhancements were correctly applied.

Even if the enhancements were erroneous, however, Thomas's objections fail because he cannot make a plausible showing of prejudice. Thomas principally argues that, if his counsel had informed him that the relevant conduct did not support some of the enhancements recommended in the agreement, then he would have negotiated a more lenient agreement. To prevail on this claim, Thomas would have to "show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." *Brock-Miller v. United State*s, 887 F.3d 298, 312 (7th Cir. 2018) (quoting *Missouri v. Frye*, 566 U.S. 134, 147 (2012)) (applying this standard of prejudice to a claim that but-for counsel's errors, the defendant would have "negotiated a more favorable plea agreement").

Thomas cannot make that showing. Given the uncharged conduct in the stipulated facts and the extra-plea evidence, it is completely unreasonable to believe the Government would have offered Thomas a more lenient deal if counsel had objected to the enhancements. Even if he convinced prosecutors they had erred, they surely would have added counts sufficient to maintain at least the same recommended guidelines range. Indeed, the prosecution stressed to the district court that the sentence should reflect the "harm the defendant inflicted on numerous vulnerable victims," including losses of "at least $300,000" and "likely much higher." ECF No. 28 at 10, 13.

Alternatively, Thomas argues "it is not unlikely that he would have chosen either to enter an open plea or to proceed to trial, but for counsel's errors." For the open plea claim, he must show he would have obtained a more favorable sentence but for counsel's errors. *See Garcia v. United States*, 679 F.3d 1013, 1015 (8th Cir. 2012); *United States v. Booth*, 432 F.3d 542, 546-47 (3d Cir. 2005). The claim he would have proceeded to trial is governed by the standard announced in *Lee v. United States*, 137 S. Ct. 1958, 1965 (2017) ("[W]hen a defendant claims that his counsel's deficient performance deprived him of a trial by causing him to accept a plea, the defendant can show prejudice by demonstrating a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." (cleaned up)).

Thomas cannot satisfy either standard. Again, the Government had evidence of uncharged conduct that would have supported numerous fraud counts on top of the lone extortion count in the information. It is highly improbable that Thomas would choose to proceed without a plea deal simply because defense counsel pointed out some logical inconsistencies in the Government's offer.

Because Thomas cannot show prejudice on these claims, we shall not remand them to the district court.

### 3. Demonstrated ability

Thomas's next ineffective assistance claim is that defense counsel "failed to effectively argue" that the court should not apply the demonstrated-ability enhancement of U.S.S.G. § 2B3.2(b)(3)(B)(ii). This claim must fail because the district court was bound to apply the enhancement for reasons already

stated. *Cf. United States v. Winstead*, 890 F.3d 1082, 1090 (D.C. Cir. 2018) (examining whether the argument counsel failed to raise was a "winning argument" in order to determine whether raising it would have changed the result).

### 4. Breach of plea agreement

Thomas claims defense counsel's performance was constitutionally deficient because he failed to object to the Government's breach of the plea agreement. As already discussed, however, the Government did not breach the plea agreement. We reject this claim because "failure to raise a meritless objection is not deficient performance." *United States v. Islam*, 932 F.3d 957, 964 (D.C. Cir. 2019).

### 5. Upward departures

Finally, Thomas claims defense counsel "presented no substantive argument against" the two upward departures. This is true. Nevertheless, as we explained, the departures were justified. There is no reason to believe an argument against them could have affected the outcome. We shall not remand this claim.

### III. Conclusion

We reject all of Thomas's substantive challenges to his sentence. We remand the case to the district court so it may consider his claims that he received ineffective assistance of counsel due to counsel's failure to (1) argue for or present facts supporting a *Smith* variance, or object to the district court's reasons for rejecting one, (2) raise mitigating facts contained in the Government's sentencing exhibits, (3) review the sentencing exhibits with Thomas, and (4) submit character letters Thomas's family and friends had written.

*So ordered.*

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring: I write separately to record my view that the district court "scrupulously adhere[d] to the obligations of Rule 11," *United States v. Shemirani*, 802 F.3d 1, 3 (D.C. Cir. 2015), including the requirement to "inform the defendant of, and determine that the defendant understands, . . . the terms of any plea-agreement provision waiving the right to appeal or to collaterally attack the sentence," Fed. R. Crim. P. 11(b)(1)(N). Accordingly, although I join the rest of my colleague's opinion for the Court, I depart from his conclusion that "whether the district court fundamentally mischaracterized the waiver provision is a close call." Op. at 13.

An appeal waiver is generally enforceable. *See United States v. Guillen*, 561 F.3d 527, 529 (D.C. Cir. 2009). But if a judge mischaracterizes the waiver "in a fundamental way"—at least in a way that benefits the defendant—"'the district court's oral pronouncement controls.'" *United States v. Godoy*, 706 F.3d 493, 495–96 (D.C. Cir. 2013) (quoting *United States v. Buchanan*, 59 F.3d 914, 918 (9th Cir. 1995)). This doctrine naturally follows from the premise that criminal defendants "need to be able to trust the oral pronouncements of district court judges." *Buchanan*, 59 F.3d at 918. If applicable only to a genuine mischaracterization, the doctrine fulfills a primary purpose of Rule 11—namely, ensuring that the defendant's waiver is knowing and voluntary. *See Shemirani*, 802 F.3d at 2 (citing *United States v. Vonn*, 535 U.S. 55, 62 (2002)). An appellate court, however, should not use a magnifying glass to scrutinize a minor change in phraseology that nonetheless jibes with the written document, whether or not it benefits the defendant.

Rule 11, after all, "does not say that compliance can be achieved only by reading the specified items *in haec verba*." *United States v. Saft*, 558 F.2d 1073, 1079 (2d Cir. 1977) (Friendly, J.). "To the contrary, a lifeless recitation of the plea agreement is disfavored." Op. at 12. In an ideal plea colloquy,

the judge *explains*, rather than *recites*, the waiver provision. As my colleague notes, this requires striking a "delicate balance." *Id.* The judge should "[p]rovide enough explanation to dispel any misunderstanding without simply reading the agreement aloud, but in doing so, take care not to create a new or different misconception that effectively amends the written agreement." *Id.*

The district judge struck that balance appropriately here. Under the plea agreement, Thomas waived his right to appeal his sentence "*except to the extent* the Court sentence[d] [him] above the statutory maximum or guidelines range determined by the Court." Summarizing this language during the plea colloquy, the district judge told Thomas that he was waiving his right to appeal "*unless* you are sentenced to a period of imprisonment longer than the statutory maximum or the Court departs upward from the applicable recommended sentencing guideline range[,] which is all set out in your plea letter at page 7, paragraph 10."

Granted, "unless" and "except to the extent" do not have identical meanings. *Unless* denotes an exception; *except to the extent* also denotes an exception but introduces detail about the scope of the exception. In other words, *unless* is "less precise and broader than" *except to the extent*. Op. at 13. Notwithstanding the district court's summary informed Thomas that he would regain certain appeal rights should he receive an above-Guidelines sentence, it failed to identify *which* appeal rights would be restored. Certainly the court could have—and perhaps should have—explained that an above-Guidelines sentence would not vitiate the appeal waiver *in toto*. But, in my view, its failure to do so falls far short of a mischaracterization, let alone a fundamental mischaracterization.

Faulty-colloquy cases are repeat offenders in our Court so we have a good basis to make comparisons. We have issued at least five published opinions holding that the district court's oral pronouncement contradicted the terms of a written appeal waiver. *See*, *e.g.*, *Godoy*, 706 F.3d at 495; *United States v. Fareri*, 712 F.3d 593, 594 (D.C. Cir. 2013); *United States v. Kaufman*, 791 F.3d 86, 88 (D.C. Cir. 2015); *United States v. Hunt*, 843 F.3d 1022, 1028 (D.C. Cir. 2016); *United States v. Brown*, 892 F.3d 385, 395–96 (D.C. Cir. 2018) (per curiam). All but one—*Fareri* is the exception—address waiver terms that are similar or identical to the language in Thomas's plea agreement.

In *Godoy*, the judge told the defendant that he could appeal his sentence if "the Court has done something illegal, such as imposing a period of imprisonment longer than the statutory maximum." 706 F.3d at 495 (emphasis omitted). Although the government argued that a reasonable person would interpret "such as" to mean "limited to," we rejected the argument. *See id.* In *Kaufman*, the judge told the defendant that he could appeal "if [he] believe[d] the sentence is illegal" or if he did not "like" the sentence. 791 F.3d at 88 (alterations in original). *Hunt* was similar. 843 F.3d at 1025. And in *Brown*, the judge told the defendant that he could appeal "on the grounds of reasonableness." 892 F.3d at 395. *But see id.* at 410 (Kavanaugh, J., dissenting in part) (district judge noted appeal would apply only "with regard to certain circumstances"). Each of these statements, "[t]aken for [their] plain meaning— which is how criminal defendants should be entitled to take the statements of district court judges," *Godoy*, 706 F.3d at 495— arguably led the defendant to think that he had a broader right to appeal than the plea agreement promised.

Nothing of that sort happened here. Although the district court's pronouncement was less detailed than the written

agreement, it did not mischaracterize that agreement. Moreover, the district judge's words had other virtues. "Unless" is a crisp and simple word. Its use made plain what might be obscured by the more complex "except to the extent" formulation: the precise condition that would resurrect Thomas's appeal rights.

Moreover, were we inclined to fault the district court for omitting detail, that would not automatically merit reversal. If a judge's complete failure to discuss the appeal waiver does not necessarily constitute reversible error, *see United States v. Lee*, 888 F.3d 503, 506 (D.C. Cir. 2018), neither does a single change in phraseology. What matters is whether Thomas understood what he was giving up. I agree that "[t]he natural understanding" of the district court's pronouncement "is that the right retained is the right mentioned—that is, the right to appeal the upward departure." Op. at 13. A "natural understanding" is the best evidence of what Thomas "might reasonably have understood the court to mean," *Hunt*, 843 F.3d at 1028, even if an alternative meaning—no matter how implausible—might literally be consistent with the court's words.

Labeling the district judge's words a "close call" may also have an unintended effect on judges who, notwithstanding our admonition to the contrary, may decide that the safest course is to recite appeal waivers verbatim. This, too, would hurt criminal defendants, most of whom are not lawyers and may struggle to comprehend "the dark emptiness of legal jargon." *Fisher v. United States*, 328 U.S. 463, 487 (1946) (Frankfurter, J., dissenting). But a judge who simply reads the text of the appeal waiver is unlikely to be reversed, *Saft*, 558 F.2d. at 1079—even though Rule 11's purpose would be frustrated—thus a "lifeless recitation" is what we may come to expect.